George B. Clarke and Another, Appellants, *v.* Alice A. Schell, Individually and as Executrix, etc., of Richard J. Clarke, Deceased, and Others, Respondents.

*An attorney writing himself a beneficiary in his client's will — fraud not presumed therefrom — evidence.*

The fact that two of the beneficiaries named in a will were the attorneys of the testator and drafted the will does not alone create the presumption that the bequests to them were procured by fraud.

Upon the trial of an action brought to set aside the probate of an instrument as the last will and testament of a testator, an anonymous letter received by the testator during his lifetime and offered in evidence by the plaintiffs, is wholly incompetent, where there is nothing in the letter which is relevant to the issues.

The fact that the aunt of the principal beneficiary named in a will was in early life an immoral woman, or reputed to be such, is not relevant evidence upon the trial of an action brought to set aside the probate of the alleged will; nor is it error, upon the trial of such action, to refuse to permit a witness to testify as to the impression made upon his mind by a gesture of the testator at a certain interview shortly previous to his death. The witness may describe the interview and state what was said or done, but it is not competent for him to draw the inferences which it is the duty of the court or jury to indulge in.

Appeal by the plaintiffs, George B. Clarke and another, from a judgment of the Supreme Court in favor of the defendants, entered in the office of the clerk of the county of New York on the 5th day of June, 1894, upon the verdict of a jury, rendered by direction of the court, after a trial at the New York Circuit, adjudging among other things that two papers purporting to be the last will and testament and codicil thereto of Richard J. Clarke, deceased, are the valid last will and testament and codicil thereto of the said Richard J. Clarke, and also from an order entered in said clerk's office *nunc pro tunc* as of the 28th day of May, 1894, denying the plaintiffs' motion for a new trial made upon the minutes.

*W. Bourke Cochran,* for the appellants.

*Daniel G. Rollins* and *Wm. Mitchell,* for the respondents.

Follett, J.:

This action was brought July 13, 1893, pursuant to section 2653 of the Code of Civil Procedure, to set aside the probate of the last

will and testament, and of a codicil thereto, of Richard J. Clarke, on the ground that they were not the voluntary acts of the decedent, but were procured by the fraud, coercion and undue influence of Alice A. Schell, William Mitchell and others.

Richard J. Clarke was born October 1, 1810, and died June 10, 1892, aged eighty-one years, eight months and nine days. He had never been married, and he left no ancestor nor descendant, but left George B. Clarke and William J. Clarke, plaintiffs, his first cousins, his only heirs and next of kin. He left realty valued at $41,000, and personalty valued at $110,000. He left a will, executed November 9, 1889, and a codicil, executed September 3, 1891, which are the subject of this controversy. By the first clause of the will his executors were directed to pay his debts and funeral expenses; by the second he bequeathed $25,000 to Mrs. Alice A. Schell; by the third, $1,000 to her daughter, Alice Schell; by the fourth, $1,000 to her son, Richard M. Schell; by the fifth, $250 to William Etgen, a clerk in the law office of Mitchell & Mitchell; by the sixth, $1,000 to Samuel Hopping; by the seventh, $1,000 to Eugene M. Berard; by the eighth, $5,000 to Edward Mitchell; by the ninth, $5,000 to William Mitchell; by the tenth clause, the foregoing legacies were charged upon the testator's real estate; by the eleventh, the residue was divided into two equal parts, one of which was given to Alice A. Schell and the other to his executors, who were directed to apply the income, or such portion thereof as they saw fit, to the use of Anson Clarke House during his life, with authority to convey all, or such portion of the half so placed in trust, to said Anson Clark House; by the thirteenth, he directed that in case the trust should be held invalid the one-half left in trust should go absolutely to Anson Clarke House, and by the fourteenth, if Anson Clarke House should die while any portion of the half was held in trust, that the trust estate so held should go to Alice A. Schell; by the fifteenth, he directed that during the settlement of his estate his executors should pay Alice A. Schell and Anson Clarke House each $1,200 annually; by the last clause Alice A. Schell and William Mitchell were nominated as executors and given power to sell his realty.

Anson Clarke House, for whose benefit the trust was created, died August 9, 1891, and, on the 3d of September, 1891, the testator executed his codicil, in which he referred to the death of Anson

Clarke House and revoked the eleventh, twelfth, thirteenth and fourteenth clauses of his will and gave to Mrs. Mary Divins $1,000; to Miss Emma Naylor, a sister of Mrs. Divins, $1,000; to Mrs. Mary Naylor, $1,000; to Miss Mamie Naylor, daughter of Mrs. Mary Naylor, $1,000; to Frank Naylor, $1,000; to George Naylor, $1,000; to Miss Eliza T. Wilson, $1,000; to Cecelia R. Burford, $1,000; to Mrs. Clara Lavery, $500; to Richard Divins, $500; to Miss Mamie Coonan, $500. The remainder he devised and bequeathed to Mrs. Alice A. Schell. The fifteenth clause of the will was modified by striking out the name of Anson Clarke House, and directing that fifty dollars a week should be paid Mrs. Alice A. Schell while his estate was being settled.

The general legacies, aside from those to Mrs. Schell and the Mitchells, amounted to $13,750, and, including those, to $48,750.

The main facts relied on to establish the issue tendered by the plaintiffs are that the testator gave nothing to his first cousins, the plaintiffs; that he gave $10,000 to Edward and William Mitchell, his legal advisers and the draughtsmen of the will; $2,250 to employees in their office, and the remainder of his estate to Mrs. Schell and her relatives. Considering the circumstances of the testator and his surroundings, we think these facts do not give the slightest support to the contention of the plaintiffs.

In 1819 the testator's father and his eldest brother, William B., came from England to this country and were followed the next year by the testator, his mother, his brother Thomas G., his sister Elizabeth, and his maternal uncle, John P. Brown. Subsequently a brother, Robert, and a sister, Rose, were born in this city. In 1820 John P. Brown and the testator's father established a hotel or restaurant in Maiden lane, and the business was continued by them and by the testator and his brothers until 1858, when it was abandoned. The testator's father died in 1833, his mother in 1835, his eldest brother, William B., in 1837, his sister Rose in 1844, his brother Thomas G. in 1865, his brother Robert in 1884, and his sister Elizabeth in 1887. None of his brothers or sisters left descendants.

For more than forty years prior to 1884 the testator lived at "Anson House," a hotel or boarding house in Canal street, kept by Anson House and his wife Sophia, and there his brother Robert

lived for many years until his marriage, when he left. Mrs. House was an aunt of Mrs. Alice A. Schell, and Anson Clarke House was an illegitimate son of Anson House. Mrs. Schell was much at Anson House and had known the testator from her childhood. About 1884 Anson House died leaving his widow, and, subsequently, the hotel which they had kept for many years was abandoned, and the testator and the widow, Mrs. Anson House, took separate rooms at the St. Nicholas Hotel, on Washington place, in this city, kept by Julius A. Robinson. Mrs. House remained in this hotel until her death, which is stated by one witness to have occurred June 25, 1886, and by another June 20, 1887. The evidence is that until Mrs. House's death the testator and Anson Clarke House occupied room 88, and after her death room 72, sleeping in the same bed, until Anson Clarke House became ill, when they occupied single beds in the same room. During all this time Mrs. Schell and her daughter frequently visited the testator and cared more or less for his wants. It is charged, but the charge is not supported by evidence, that the testator and Mrs. Anson House, and after her death, the testator and Mrs. Schell, sustained improper relations. The evidence called out in behalf of the plaintiffs shows conclusively that the relations existing between the testator and Mrs. Schell and her family were for many years most intimate and friendly, but, as before stated, does not sustain the charge of improper intimacy. The testator's cousin George B. Clarke lived in Brooklyn. They seldom saw each other, and had little or no intercourse. The other cousin, William J. Clarke, the testator never saw. Under such circumstances we do not think that the fact that the property was given to those with whom he had sustained most intimate relations for half a century, to the exclusion of two cousins, one of whom he never saw, and the other of whom he seldom saw and with whom he had little intercourse, is a circumstance tending to show that the testator was unduly influenced, coerced or defrauded into making his will.

Under the circumstances of this case, we do not think that the bequest of $10,000 to his attorneys and of $2,250 to their employees raises a presumption of undue influence on the part of his counsel, who drafted the will. Prior to 1885 James B. Bullock had been the testator's legal adviser, and Mitchell & Mitchell had been

employed to assist in conducting a litigation in which the testator was involved. About 1885 Bullock died, leaving a will of which Richard J. Clarke was the executor, and the estate was settled through the aid of Mitchell & Mitchell, who succeeded Bullock as the counsel of the testator. Besides this, the firm assisted Mr. Clarke, who was the representative of his deceased sister Elizabeth, in settling her estate. This brought him frequently to the office of his counsel and made him acquainted with their employees. The undisputed evidence is, that during his life he was accustomed to give liberal gratuities to the servants in the hotel where he boarded, and made liberal presents to those who served him. The fact that two of the beneficiaries in the will were the attorneys of the testator, and drafted the will, does not alone create a presumption that the bequests to them were procured by fraud or undue influence. (*Matter of Will of Smith*, 95 N. Y. 516.)

The plaintiffs called a witness who testified that in November, 1876, Richard J. Clarke executed a will to which the witness became a subscribing witness. He testified that the testator told him that he left his property to his sister Elizabeth, to Anson Clarke House, and to relatives in Brooklyn. The amount given to each was not stated, and the will was not produced. On the 20th of September, 1887, the testator executed a will in which he gave substantially the same general legacies to the same persons, excepting Mrs. Schell, to whom he made bequests in his last will and codicil thereto. He gave to Mitchell & Mitchell $10,000 as in his last will. The remainder of his estate he devised in trust for the benefit of Anson Clarke House, with power to the executor to vest House with the absolute title, and the remainder over, if not so vested, to three charitable institutions. When this will was executed his sister was dead. Anson Clarke House, whom he treated as an adopted son, was living, and when he died he changed his will and increased the legacy of Mrs. Schell from $1,000 to $25,000, and gave the residue to her. This, under the circumstances, does not seem to us to have been such an unnatural disposition of his estate as to arouse the slightest presumption of undue influence. His Brooklyn cousin was then seventy-eight years old, and whether he required aid or assistance does not appear. It is certain that no such relations ever existed between them as entitled him to a claim upon the bounty of

the testator. The evidence is that the testator, for a man of his years, was in good health until a short time before his death, and that he transacted his business with intelligence and accuracy. It seems to us that the record is barren of any evidence which tends to show that this will was procured by fraud, coercion or undue influence, and that there was no question of fact for the jury and no error committed in directing a verdict for the defendants. Three exceptions to the exclusion of evidence were argued. It was testified that Mr. Clarke at one time received an anonymous letter, which the witness copied, and the copy was produced at the trial (Exhibit 24) and was offered in evidence, and excluded. There is nothing in the letter which is relevant to the issue, and, besides, it was not an act of the testator, or of any of the defendants, and was wholly incompetent. The plaintiffs offered to show that early in life Mrs. House had borne another name and was reputed to be a woman of bad character and a keeper of a house of assignation. She had been married to Anson House for more than forty years, and there was no attempt to show that during her married life she was a woman of bad repute. Mrs. House had died before the will was executed, and the fact that the aunt of the principal beneficiary in early life was an immoral woman, or reputed to be such, was not relevant. No error was committed in refusing to permit the witness Neiderstein to testify to the impression made on his mind by a gesture of the testator at an interview in the St. Nicholas Hotel on the 1st of October, 1891. The witness described the interview, stated what was said and done, and it was not competent for the witness to draw the inferences, which was the duty of the court or jury.

After a careful reading of the whole of this voluminous record, we are of the opinion that no error was committed by the learned trial court, and that the judgment and order should be affirmed, with costs.

VAN BRUNT, P. J., and PARKER, J., concurred.

Judgment and order affirmed, with costs.