In re BENJAMIN'S WILL.

(Surrogates' Court, New York County. September 13, 1911.)

1. EVIDENCE (§ 588*)—CREDIBILITY OF WITNESSES.
   In weighing evidence it is necessary to consider the attitude of a witness, and, if possible, his motive, as well as his apparent interest.
   [Ed. Note.—For other cases, see Evidence, Cent. Dig. § 2437; Dec. Dig. § 588.*]

2. WILLS (§§ 52, 163, 289*)—PROBATE—PRESUMPTION AND BURDEN OF PROOF.
   The proponents of a will must establish that at the time of making the will testator had an intelligent freedom of action, that there was a sufficient execution of the will, and that testator possessed the requisite capacity to make a will.
   [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 101–110, 388–402, 653–661; Dec. Dig. §§ 52, 163, 289.*]

3. WILLS (§ 116*)—COMPETENCY OF WITNESSES.
   Private persons may act as attesting witnesses to a will.
   [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 284–298; Dec. Dig. § 116.*]

4. WILLS (§ 302*)—CONTEST—SUFFICIENCY OF EVIDENCE—EXECUTION.
   Evidence upon a will contest *held* sufficient to establish the fact of execution.
   [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 575, 581, 700–710; Dec. Dig. § 302.*]

5. WILLS (§ 120*)—EXECUTION—REQUEST TO WITNESSES.
   A request by testator to attesting witnesses, made in some form, is necessary.
   [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 314–317; Dec. Dig. § 120.*]

6. WILLS (§ 42*)—TESTAMENTARY CAPACITY—INVALID AFTER FIRST APOPLECTIC STROKE.
   A first apoplectic stroke does not necessarily and per se incapacitate a person from ever afterwards making a will, since such person may be restored to almost normal health of body and mind.
   [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 86, 87; Dec. Dig. § 42.*]

7. WILLS (§ 55*)—CAPACITY—EVIDENCE—REQUESTING ALIENIST TO WITNESS WILL.
   That the beneficiaries under a will requested an alienist to witness the will is not a suspicious circumstance on the issue of the testator's mental competency.
   [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 137–158, 161; Dec. Dig. § 55.*]

8. EVIDENCE (§ 571*)—WEIGHT—EXPERT TESTIMONY—TESTAMENTARY CAPACITY.
   Where the proponents of a will and the contestants each called one medical expert on the question of mental capacity, and on hypothetical questions framed by the respective sides, covering a period of four years and including many disconnected, trivial, and insignificant circumstances, most of them as consistent with mental capacity as with mental incapacity, their opinions were diametrically opposed, the surrogate as trier of the fact cannot separate the facts to ascertain on which facts the experts relied, and must determine for himself the question of mental capacity.
   [Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2395–2398; Dec. Dig. § 571.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

9. WILLS (§ 31*)—TESTAMENTARY CAPACITY—MEASURE.

The law is liberal as to testamentary capacity and disposition, and does not require too great a degree of intellectual capacity for an act of testamentation.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 66–68; Dec. Dig. § 31.*]

10. WILLS (§ 55*)—TESTAMENTARY CAPACITY—WEIGHT OF EVIDENCE.

Unsoundness of mind must be clearly established to take away testamentary power.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 137–158, 161; Dec. Dig. § 55.*]

11. WILLS (§ 54*)—TESTAMENTARY CAPACITY—ADMISSIBILITY OF EVIDENCE—DECLARATIONS OF TESTATOR.

On the issue of testator's mental capacity, his written and spoken declarations are competent, not as evidence of the truth of such declarations, but merely to enable the court to determine objectively the testator's mental capacity or incapacity.

[Ed. Note.—For other cases, see Wills, Cent Dig. §§ 131–134, 136; Dec. Dig. § 54.*]

12. WILLS (§ 55*)—TESTAMENTARY CAPACITY—WEIGHT OF EVIDENCE.

Evidence on a will contest *held* to establish the testamentary capacity of testatrix.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 137–158, 161; Dec. Dig. § 55.*]

13. EVIDENCE (§ 226*)—ADMISSIONS—PARTIES TO WILL CONTEST.

Admissions by one of two beneficiaries under a will, charged by contestants with undue influence and conspiracy, are incompetent as against the other beneficiary.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 815–821; Dec. Dig. § 226.*]

14. COURTS (§ 202*)—PROBATE COURT—PROCEDURE.

Technical common-law rules of evidence have little relation to procedure in the Surrogate's Court.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 480–486; Dec. Dig. § 202.*]

15. APPEAL AND ERROR (§ 883*)—RIGHT TO ALLEGE ERROR—RECEPTION OF EVIDENCE.

On the contest of a will on the grounds of undue influence and conspiracy between the two beneficiaries thereunder, contestants who stipulated that declarations of an alleged conspirator be admitted in advance of proof of the conspiracy, but to be stricken out if not connected with a conspiracy, could not complain of their reception.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 3611; Dec. Dig. § 883.*]

16. WILLS (§ 166*)—UNDUE INFLUENCE AND CONSPIRACY—WEIGHT OF EVIDENCE.

Evidence on a will contest *held* not to show a conspiracy between the beneficiaries thereunder to induce a will in their favor.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 421–437; Dec. Dig. § 166.*]

17. WILLS (§ 155*)—UNDUE INFLUENCE—PERSUASION.

Where an elderly single woman had been for many years the companion and dependent of testatrix and had lived intimately and affectionately with her in the same family, giving her the care which her invalid condition required, her manifested desire that testatrix should make a will

was not of itself wrong, since under such circumstances the law tolerates reasonable importunity for testamentary provision.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 375–381; Dec. Dig. § 155.*]

18. WILLS (§ 166*)—UNDUE INFLUENCE—WEIGHT OF EVIDENCE.

Evidence on a will contest *held* not to establish undue influence; mere opportunity to exercise undue influence, standing alone, not being sufficient.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 421–437; Dec. Dig. § 166.*]

19. WILLS (§ 166*)—UNDUE INFLUENCE—CONFIDENTIAL RELATIONS—TESTAMENTARY GIFTS.

The existence of a professional relation is not in every case sufficient of itself as evidence of undue influence, but testamentary gifts to persons occupying a confidential relation toward a helpless testatrix will be viewed with suspicion and subjected to great scrutiny.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 421–437; Dec. Dig. § 166.*]

20. WILLS (§ 157*)—UNDUE INFLUENCE—PROFESSIONAL OR CONFIDENTIAL RELATIONS.

Testatrix, who had suffered a first apoplectic stroke and had been an invalid for four years preceding her death, and who left no relative nearer than a cousin, gave legacies amounting to about $5,000, and divided the residue of her estate, amounting to $32,000, between her physician and friend, and her companion and nurse during the four years who had lived at her house in terms of intimacy and affection. *Held*, that such legacies were natural and proper under the circumstances, and did not indicate the exercise of undue influence.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 383, 384; Dec. Dig. § 157.*]

In the matter of the probate of the will of Alice Eliza Benjamin, deceased, contested by Adelia A. Crawford, on the grounds of want of execution, want of testamentary capacity, and undue influence. Decree admitting will to probate.

J. Brownson Ker, for proponents.

Charles W. Ridgway and David Burr Luckey, for contestant.

FOWLER, S. The probate of the last will and testament of Alice Eliza Benjamin, deceased, is contested by Adelia A. Crawford, claiming to be the next of kin and heir at law of the testatrix. The objections interposed to the probate present the usual grounds of contest: (1) Denial of the factum of will; (2) want of capacity in testatrix; and (3) undue influence exerted over the testatrix.

The proofs taken at the hearing disclose that the contestant is a first cousin of testatrix, but that she was not for many years on terms of intercourse with Mrs. Benjamin. It seems that there had been some dispute in another generation over a family will, and the acquaintance between the testatrix and the contestant thereafter ceased, and it was not renewed. Mrs. Benjamin felt aggrieved by the contestant's action in this regard.

Mrs. Benjamin, the testatrix, was for many years a widow, living alone in this city, with a companion or attendant by name Laura A.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Calvert. Miss Calvert had been in the service of Mrs. Benjamin's mother, and at the latter's death accompanied Mrs. Benjamin to her new abode, where they remained for many years and until Mrs. Benjamin's death. Miss Calvert is made one of the two residuary legatees by the contested will. It is in view of this fact and of the issues of undue influence and mental incapacity that the testimony concerning the daily life of Mrs. Benjamin's household becomes here important. This testimony covers all these points at great length, and it occupied many sessions of the court.

It is apparent from the testimony that Mrs. Benjamin's life was not dissimilar to the lives of those who are bereft of near kindred in their advancing years. With illness she became naturally more and more dependent upon the ministrations of those who were strangers to her in blood, and to such persons she was indebted for her daily society and for her material comforts. In Mrs. Benjamin's case the evidence discloses that she had few disinterested friends, or even disinterested acquaintances. She was a woman of substance, practically without ties of family, and in late years she had little to offer in return for attention except material things. It is also evident that such things were not despised by those whose intercourse with testatrix was most familiar. The evidence discloses to the surrogate that the beneficiaries under the will in question were in this respect, even if the evidence on the part of the contestant be taken as true, not an exception in the ordinary daily intercourse of this solitary testatrix. But it is when we come to contrast the behavior of the legatees under this will now in court with the conduct of some of those whose testimony has been offered for the contestant that the legatees appear to the best advantage. Their conduct toward the testatrix was certainly more respectful and considerate than was that of the contestant's own witnesses, who openly strove to be made executors or to be remembered by Mrs. Benjamin in her will. This particular side of the case, although plain, is not edifying.

[1] In weighing evidence it is necessary for the court to consider the attitude of a witness, and, if possible, his motive, as well as his apparent interest, for upon such indicia depends the value of all human testimony. It was an old rule of the ecclesiastical courts in testamentary causes "that a party was to be known by his witnesses." It is perhaps an inference that this rule is not obsolete in modern courts of probate, for it is certainly founded on good sense and in the end means no more than that the character of all testimony is to be taken into the final account.

In April of the year 1907 Mrs. Benjamin, then about 58 years of age, was on a journey of pleasure with her companion, Miss Calvert, to the Pacific Coast. On their homeward route Mrs. Benjamin suffered an apoplectic attack of great severity, and for eight weeks thereafter was detained in Kansas City, Mo., by this serious illness. She sufficiently recovered after that time to be brought to her home in this county. But she remained a paralytic for the rest of her life, about four years. That during this long interval testatrix sufficiently regained her mental faculties to carry on her ordinary affairs for her-

self is, I think, apparent from the testimony of contestant's own witnesses, one of whom was in the constant receipt of her charity and another of whom was the recipient of her gifts of some value. The conduct and the intercourse of these witnesses with Mrs. Benjamin afford one, and perhaps the best, negation of their evidence against her mental or testamentary capacity. But I shall touch on these points in detail later.

Much of the testimony offered by contestant turns upon the mental capacity of testatrix, and it relates in the first place to Mrs. Benjamin's first apoplectic seizure in 1907. The assertion on the part of contestant would seem to be that mental degeneracy dates from that time, or else that the recovery was never sufficient to restore to testatrix "the sound and disposing mind" which the law requires for an act of testamentation. But the evidence does not seem to the surrogate to bear out either of these negative hypotheses advanced by contestant. In the judgment of the surrogate Mrs. Benjamin's mind before the act of testamentation again became a "legal mind," with all that that term implies in probate law. In this court the criteria of such a mind are definitely determined by tests applied for centuries by probate judges of distinction and authority. If we abide by their decisions we shall not err. There may be differences of opinion in other tribunals upon these tests, but in the courts of the surrogates, possessed for upwards of 200 years in New York alone of a yet more ancient and established probate jurisdiction, dealing particularly with such issues, the precedents have become most precise and even conclusive, if we will have regard to testamentary law only. But before attempting to apply these authorities, which he conceives to be binding in this particular cause, the surrogate will proceed to review the facts deemed to be established on the hearing in so far as they are pertinent to the first contention of those who are here to oppose the probate.

That Mrs. Benjamin's speech was at first much impaired after her return to town is apparent. Her physical condition is shown to be that of one who had had a first apoplectic seizure, commonly called a "stroke." She was paralyzed on the left side, denoting ordinarily a cerebral lesion, or an extravasation in the right hemisphere of the brain. But in any event, in some four months after her first attack, Mrs. Benjamin was able to walk a little with assistance, and her speech was doubtless gradually restored to her so that she was able to talk with visitors and with her people of business. I think it is most evident that such conversations ultimately became entirely coherent and rational through the balance of the year 1907, and throughout the years 1908, 1909, and at least a greater part of the year 1910, and at the time of the will.

That after her first attack Mrs. Benjamin was never restored to a normal condition of physical health is apparent. That her whole life thereafter was that of an invalid is also apparent, as it is that she was querulous and saddened at times, as permanent invalids are apt to be; but that she was thereafter demented is not apparent. The testimony of each witness called discloses that the witness dealt with

Mrs. Benjamin on the basis of rational intercourse. In this respect their actions govern, their testimony to the contrary.

Occasionally throughout this long period of invalidism Mrs. Benjamin was able to go out of doors in a wheelchair or to shop in the neighborhood of her dwelling. After she had acquired an automobile she was able to take drives even extended into the country. During all this period she saw to her own affairs and received visitors, none of whom has given any evidence tending to show a deficiency of ordinary intellectual power on the part of Mrs. Benjamin. To be sure, this ground has been well raked over by contestant, and some peculiarities of the testatrix have been found which some lay witnesses have been willing to characterize as irrational. But when I come to that point I shall be constrained to weigh such testimony in the balance with the counteracting testimony of the proponents' witnesses— for they are widely apart.

Prior to 1907, as subsequent thereto, Mrs. Benjamin's ordinary household consisted of a maid servant, in addition to the Miss Calvert who is one of the legatees under the disputed will. Occasionally a nurse was required by Mrs. Benjamin in addition. As the charge of conspiracy and undue influence is made by contestant against the residuary legatees, it is necessary to inquire who Miss Calvert was. It appeared in evidence that she was the elderly daughter of a clergyman, and that she had entered the service of Mrs. Benjamin's mother and continued after that lady's death in Mrs. Benjamin's own service, but in some undefined and general capacity. That she was not a menial servant, as claimed by the contestant, is apparent, if indeed any honest and necessary labor well done is under the changed economic conditions longer to be called "menial" in law, when in fact all such labor is become honorable as never before in the history of the world. But be this as it may, it is apparent in any event in the evidence that in education Miss Calvert was equal to her employer. The witnesses who spoke of her as a menial are mistaken. She was, in truth and in fact, a highly respectable and efficient ministress and companion of her employer. Miss Calvert's employment was arduous and exacting, and it was appreciated. The witnesses of most weight and intelligence have, I think, spoken of Miss Calvert with the deference which her highly respectable appearance and demeanor on the witness stand would seem to demand. As it is this person who is charged in the main with a scheme of deliberate fraud and circumvention in this cause, her position, actions, conversations, and letters have been the object of very minute inquiry on the part of the contestant. When I come to consider the charge of conspiracy, all these elements must be given what I conceive to be their proper weight as evidence. It is alleged by contestant that the other conspirator for this will was for some years the attending physician of Mrs. Benjamin. As he is the executor named in the will, and with Miss Calvert is given an equal share of the residuary of Mrs. Benjamin's not great estate, he now appears before me as the proponent of the will in dispute. It is this professional gentleman and Miss Calvert who are charged by contestant with no less grave offenses than conspiracy,

fraud, and circumvention. Such charges are not uncommon in this court, but they must always be substantiated by a preponderance of proof to be here effective.

The will now in controversy was made by Mrs. Benjamin on the 14th day of November, 1910, just four months and six days prior to her death. It provides for pecuniary legacies to various female friends of the testatrix and gives a thousand dollars to a former rector of an Episcopalian Church once attended by Mrs. Benjamin. These legacies, including one to Mrs. Benjamin's servant, Anna McMoore, aggregate over $5,000. These preferred legatees are charged with no offense by the contestant. The residue of Mrs. Benjamin's estate, admitted to be upwards of $32,000, is divided between her physician and Miss Calvert. Prior to the making of the will now before me Mrs. Benjamin had been in the physical condition already mentioned. As she drew toward her end, her physical health naturally did not improve; but that there was any further decay of her mental faculties is not sufficiently apparent.

[2] This brief summary of the leading facts, which I deem to be established, brings me to the 14th day of November, 1910, when the will in controversy was executed by Mrs. Benjamin. This date is the most important one, as it is on this day that the proponents must establish intelligent freedom of the testatrix's action, a sufficient execution of her will under the statute of wills, and the capacity of testatrix to make a will. Capacity goes to the making of any will and not to the making of this particular will, but "freedom of action" must be established in respect of this particular will—as must the counter-charges of contestant relative to fraud and circumvention.

The will was executed at Mrs. Benjamin's place of residence in this city, in the presence of four witnesses, viz., the Rev. Mr. Nichols, the rector of Holy Trinity Church (of which parish Mrs. Benjamin was in her late years a member); Dr. Christopher I. Patterson, a physician and alienist of standing; Dr. Kempton and John E. Ricksicker, who were respectively her dentist and her druggist in the neighborhood of Mrs. Benjamin's house. These were the attesting witnesses to the will, charged to have been procured by fraud and duress. But there is not a shadow of evidence offered by contestant reflecting in any way on the disinterestedness, the character, the veracity, or even the entire respectability and good faith of these attesting witnesses. They are absolutely disassociated from every evil charge made by contestant. If there was any fraud or circumvention about the will, the attesting witnesses had nothing to do with it. The will itself was drawn by a most respectable and competent lawyer, who gave some evidence on the hearing. If there was a scheme of fraud on foot in respect to this will, it is entirely dislocated from the very act of testamentation.

These were the persons assembled on the 14th day of November, 1910, for the purpose of acting in the capacity of witnesses.

[3] The act of making a will is a quasi public act, or one regulated by law, which, however, in this state permits private persons to act in the capacity of attesting witnesses; and our law does not require

the presence of an official, as does the law of many other states and countries when a will is not a holograph. The ceremony of execution in this particular instance was conducted with circumspection, gravity, and entire decorum.

[4] The testimony discloses that the factum of execution is amply established, and its consideration needs no further comment at this time.

[5] It is in evidence that Mrs. Benjamin herself requested the witnesses to act. Thus this important element of the execution of a will, a request by testatrix herself to the attesting witnesses to act, is in this cause amply established. Rogatio testium, or such a request to the witnesses, in some form is, by the law of this state as it is by the civil law (which is the original of all probate law), indispensable since our present statute of wills.

That animus testandi, or the intention of testatrix to make this particular instrument her last will and testament, is adequately established prima facie the surrogate can entertain no doubt. Mrs. Benjamin was particularly interrogated as to each bequest and her reasons therefor at the session held for the execution of her will, and she gave good and sound reasons. The testimony of the physician and the clergyman is clear and convincing on this point, and it is in no way contradicted or impeached. They also gave the usual testimony to establish prima facie that the testatrix was competent and not under restraint at the time the paper propounded was executed.

The celebration of the will being made out in due form of law, I shall now proceed to consider the voluminous evidence bearing on the capacity of the testatrix to make any will.

[6] It is probably not claimed by the contestant, and if it were I should pay it no attention, that a first apoplectic stroke necessarily and per se incapacitates a patient from ever after making a will. Such a claim would be too large, as the progress of such disorders is known to differ in different instances, and many persons so afflicted are restored to almost normal health of mind and body. But this is not invariably the case. It is for us now to inquire what the weight of evidence really discloses on this point in the instance of this testatrix; for, if she is proven to be mentally incompetent at the time of making the will propounded, it must fail of probate. It must be remembered that the four attesting witnesses testify to the mental competency of testatrix, and that one of them was an expert in mental disorders.

[7] That the alienist became a witness at the instance of the beneficiaries has been held in this state not to be a suspicious circumstance. Matter of Journeay, 15 App. Div. 567, 44 N. Y. Supp. 548, affirmed 162 N. Y. 611, 57 N. E. 1113.

To make such alienist an attesting witness was not in this instance an improper precaution, if we consider the character of Mrs. Benjamin's friendships, as shown by the evidence. This evidence on this point tends to establish a certain indelicate ambition on the part of some of her friends to succeed as her heir or executor, which is little short of remarkable. It was reasonable to suppose that such aspirants for favor, if disappointed, might prove unfriendly when the

time for dividing the property of the testatrix should inevitably arrive. That such deliberate precautions were necessary is certainly a melancholy fact in the life of this childless testatrix. But such a course is now established to be not even a suspicious circumstance in any case, and on that decision I must rely, as it is final.

As against the evidence indicated we have the opinion of lay witnesses as to certain acts and declarations of the testatrix which the witnesses deemed irrational. The conduct and declarations in question are so harmless or fragmentary and so unrelated to insanity in law as to make the lay opinion in this instance of little value upon the issue of Mrs. Benjamin's mental capacity. Almost any person of eccentric or morbid temperament, or even any normal person off their guard, may be proved to have made speeches or to have performed acts which a casual observer may characterize as irrational. But such evidence is to be weighed with great care, and if the conduct and declarations characterized as irrational are trivial and inconsequential, such testimony, it seems to the surrogate, should carry little weight upon an issue of mental competency. But if I give these lay and immature opinions merely numerical weight, as was done originally in the law of evidence, such opinions are offset by the similar opinions of those called for the proponents in support of the probate. I would particularly refer to the testimony of Mrs. Bentley, Mrs. Goerisch, and the Rev. Mr. Nichols, which shows that Mrs Benjamin, while a helpless paralytic, was a rational being at the time she made her will. This last testimony strikes me as very natural and as most consistent with the circumstances established on the trial.

[8] I now come to the testimony of the medical experts, one called for each side. Both of the gentlemen called to the stand were entirely competent to give expert testimony, and both were obviously men of standing and professional experience. But their opinions are diametrically opposed. One sees evidence of incompetency in the hypothesis carefully framed to elicit his negative opinion, while the other sees evidence of sanity and competency under the hypothesis framed to elicit the contrary. There are times and occasions when the opinions of experts ought to carry great weight on an issue of sanity. But much depends on the character of the hypothesis put by counsel to the witness. If the hypothesis is well and sufficiently put, and if it corresponds precisely with facts proven, which are of themselves competent on the issue of insanity, and the case is technically one of great complexity or difficulty, the opinions of experts may be entitled to weight. This was not the case on this trial. The hypothesis was here framed within the proofs, but the circumstances detailed in the hypothetical question covered a period of four years and involved the most trivial and inconsequential circumstances, such as that "after her first attack in 1907 Mrs. Benjamin was carried downstairs, put in a carriage, taken from the carriage at the station, put into an invalid chair," and so forth and so forth, in great detail, through all the disconnected acts of four years' duration which contestant gave in evidence. Most of such acts are neither inconsistent with insanity or sanity to the mind of the ordinary observer, and the surrogate cannot separate them to ascertain on which

facts the experts relied. That the triviality of the facts placed in the hypothetical question was not the fault of the learned counsel is evident, for they had to employ such evidence of sanity or insanity as the testimony fairly supplied. If the evidence was insignificant and trivial, the hypothesis, under the law regulating hypothetical questions, could not be grave and to the point. The fountain could go no higher than the source without more artifice than was apparent.

But the surrogate is not without guidance under the circumstances just denoted, and this he had in mind on the trial. In Dobie v. Armstrong, 27 App. Div. 520, 50 N. Y. Supp. 801, affirmed 160 N. Y. 584, 55 N. E. 302, it was in substance held:

"The conflicting opinions of experts, in respect to the sanity of a testator, given in answer to hypothetical questions based on acts and expressions separated from each other by years, but so united in the question that they apparently represent a continuing state of mind, and, upon assumed and isolated facts covering a long lifetime, about which facts the experts have no personal knowledge, and many of which assumptions rest upon very slight evidence and might not be sustained by the jury, do not present a question of fact for the jury."

If we apply this sensible rule of law to this case, and it is applicable to any trier of the fact as well as to a trial by jury, we shall be able to see that the expert opinions have been in this instance of very little real assistance to the surrogate. The facts in this cause were not complex, and the expert opinions are hopelessly at odds. The surrogate must in any event determine for himself whether or not Mrs. Benjamin was capable, compos mentis, at and during her act of testamentation. What, then, are the legal requirements in her case? What degree of mental capacity did Mrs. Benjamin not possess which is sufficient to invalidate her deliberate act of testamentation? What are the true boundaries of testamentary capacity and of mental dereliction?

[9, 10] The law is not too exacting in the case of testamentary capacity and dispositions. It does not on the one hand, permit all persons, except those of unsound mind, to dispose of their estates, by last will and then, on the other hand, deprive them of the power by implication or by suspicion or by the dexterous grouping of unrelated and inconsequential eccentricities of mind or body. This the law does not do. Unsoundness of mind must be clearly and fairly established to take away a testamentary power. The fact that Mrs. Benjamin's first stroke may have temporarily caused mental aberration did not deprive her of the power of again making her will when her mental health was measurably re-established, as it undoubtedly was. This precise point was held in the exemplar of this jurisdiction more than a century ago, and it has since never been questioned. 1 Phillmore, 90. The point itself (like most similar rules) is, indeed, much more than a thousand years old. J 2. 12. 1. Mens insana is necessarily always an individual matter. General tests of insanity, more or less uniform, are only established inferences or deductions from particular cases, and they assume the form of a rule only when they are universal in operation. It is natural that such rules should be established in the tribunal where the cases involving insanity are most frequent. The surrogate has had frequent occasion to examine and apply these tests as far as his limited

powers enabled him so to do. In this cause, involving only Mrs. Benjamin's sanity or insanity, he sees no indicia of mental unsoundness worth considering. The proper facts on which to predicate insanity are, in Mrs. Benjamin's case, wholly wanting.

The law does not require too great a degree of intellectual capacity for an act of testamentation. In Stewart v. Lispenard, 26 Wend. 255— a case since, however, questioned, but not always with just comprehension of its principle—the Court of Errors of this state conceded that one of very low grade of intelligence might under due precautions well execute a will. So it has been held that a monomaniac on some points (3 Addams, 79; Dobie v. Armstrong, 160 N. Y. 593, 55 N. E. 302), and even a person habitually insane, may, during a lucid interval, make a will (Matter of Taylor, 1 Edw. 375; Gombault v. Public Adm'r, 4 Bradf. Sur. 226). In the most recent case bearing on this subject (Calligan v. Haskell, 143 App. Div. 574, 128 N. Y. Supp. 293), it was held that:

"One may be peculiar, even insane upon some special topic, and yet have capacity to make a will."

These are of course extreme cases which I have cited, and to be approached with great caution.

[11, 12] But in this case Mrs. Benjamin had no such glaring faults as those specified in such decisions; she was neither imbecile nor monomaniac; she labored under no delusion or mental obliquity. She was simply an invalid, with the mental temperament of an invalid. It was attempted to be proved that she labored under unreasonable apprehension of loss of fortune; but as this was after she had incurred great expense by reason of illness and the acquisition of an automobile, both very taxing on those of moderate means, such apprehensions, I think, furnish no evidence of insanity, but of the reverse.

The mental incapacity of Mrs. Benjamin was attempted to be made out by means of her declarations, written and spoken. Such declarations are entirely competent as evidence on an issue of undue influence or mental capacity. But the declarations themselves are not evidence of the truth of the statements thus proved. The purpose of receiving such statement at all is merely to enable the court or the jury to determine objectively the sanity or insanity of the deceased maker of the declarations. The learned counsel for contestant, I think, have overlooked the qualifications of the rule admitting such statements, for wherever they find some critical opinion or some innuendo contained in such statements by Mrs. Benjamin reflecting on Miss Calvert's conduct or attention, counsel produce it as proof positive of the fact. Legal proof it is not. But in any event these declarations amount to no more than the querulousness of an invalid who seemed to spare none of her acquaintances at times. Such proofs are too trifling to be regarded as evidence of insanity or as the gravamen of the serious offenses here charged against the law of wills.

[13] It having been duly established that Mrs. Benjamin possessed the required testamentary capacity, it remains for the surrogate to consider the testimony bearing on the charges of undue influence and

conspiracy. Was this will Mrs. Benjamin's act or that of another? The "undue influence" charged is, of course, that of Miss Calvert. For the purpose of convicting her of this offense, the contestant by means of a charge of conspiracy with her coresiduary legatee was enabled to draw in evidence her letters to Mr. Kelly, under objections. If such letters are evidence at all, they are only evidence in the event I shall find a conspiracy, for as "admissions" only it is well established they are not evidence against her colegatee. I shall refer to the law of conspiracy later. As "admissions" purely such letters are not competent. One legatee is not allowed to admit another legatee out of court, or by such admissions to destroy a will made in the favor of other persons who admit nothing of the kind. The equity of this rule is apparent. Matter of Kennedy, 167 N. Y. 163, 60 N. E. 442; Matter of Myer, 184 N. Y. 58, 76 N. E. 920.

The charge of undue influence is attempted to be made out in this case mainly through the instrumentality of two witnesses, Mrs. Knapp and Mr. Kelly. In the brief of the contestant's counsel Mrs. Knapp is described as "a simple Christian lady, with all due respect for the truth." As the whole case of contestant seems to the surrogate to be founded on such assumptions, the surrogate is compelled to consider their validity. Mrs. Knapp was the most active "maintainer" of this litigation to defeat the will, although she had by law no possible interest in the outcome. She it was who found the witnesses for the contestant, furnished the facts, and in her vindication of contestant's rights she spared no pains and was untiring. I will not say that such conduct on the part of a stranger to a litigation is forbidden by the law, although "maintenance and champerty," are still forbidden. But that such conduct is "Christian" may at least be open to doubt. On this point I have no opinion; but that such conduct deprives Mrs. Knapp's testimony of that neutrality and character which the highest ethics demands of witnesses in any court of justice I have no doubt.

Mrs. Knapp was a pensioner of Mrs. Benjamin's and in constant receipt of her charity. Mrs. Benjamin pitied Mrs. Knapp's hard fate, and as she was a fourth cousin of testatrix, although by law not entitled to inherit from her in any way, testatrix gave to Mrs. Knapp freely in her lifetime and to the limit of her moderate means, even making some small settlement on her just before Mrs. Benjamin's death. During Mrs. Knapp's entire intercourse with Mrs. Benjamin Mrs. Knapp's most illiterate letters were one long importunity for the favor of Mrs. Benjamin or invocations of blessings on her. These letters are absolutely inconsistent with the condition of mental incapacity which Mrs. Knapp testifies to on the stand. As Mrs. Knapp was a constant visitor to Mrs. Benjamin's house, her opportunities of investigating Mrs. Benjamin's affairs were ample; but that Mrs. Benjamin wearied of her attentions at times is also evident. Mrs. Knapp's attitude in the house is perhaps significantly shown by a single extract from the evidence. On a day when a will was in contemplation at Mrs. Benjamin's house, Mrs. Knapp was present, and she was found listening in the hall at the door, and on being reproved,

and very properly, for such conduct by the respectable servant of Mrs. Benjamin, Mrs. Knapp said:

"I think my Alice is making a will, and I don't hear my name, but I hear your name."

This fact Mrs. Knapp herself confessed on the stand. What great weight can the surrogate attach to the evidence of this person upon such delicate questions as mental capacity and undue influence?

After Mrs. Benjamin's death, Mrs. Knapp sought out the Mr. Kelly, who is also a witness on the part of the contestant and who produces the letters from Miss Calvert to which counsel on both sides attach, I think, undue importance. On the part of the contestant these letters are claimed to bear on the charge of conspiracy or undue influence, or both. That such letters are not evidence unless the promise to show conspiracy is fulfilled may be true, as proponents' counsel contends. The questions of evidence have been discussed by counsel for both sides with great nicety and as if this were a trial by jury. On such matters of procedure in this court I deem it my duty, although with great reluctance, to make some general observations on a practice which has grown up in this court, as it does not meet my approval. I refer to obstructive and useless objections to the introduction of evidence on the trial. One-half of these objections are referable to no system—much of the residue is productive of no good to any one concerned.

[14] Many objections have been taken on this trial to the introduction of evidence, as is now the custom here, although the technical common law of evidence has little precise relations to trials in a court of probate. Wright v. Doe, Tatham, 7 A. & E. 375; Lord Mansfield in Berkely Peerage Case, 4 Camp. 414; Misner v. Strong, 181 N. Y. 169, 73 N. E. 965; Sweet v. Henry, 175 N. Y. 281, 67 N. E. 574. The common law of evidence is the product of the jury system, where it is rightfully applied and belongs. It has little historical or technical relation to trials in this court, except in a few special instances. In the land where it originated much of the common law of evidence has about ended its usefulness, and by a most distinguished authority of that country it is now conceded to be in a "state of decay." In this country it is otherwise. There are often more objections interposed to the introduction of evidence in one civil trial in this country than are taken in all England in a hundred like cases. Appeals involving matters of evidence have become so rare in the country where the common law of evidence originated as to be almost negligible, whereas most of our reports are still crowded with technical discussions on these barren points of procedure. This condition is, I think, in part due to our frequent and extraordinary reception of a modern English treatise, cited to me at least twenty times on this trial, although seldom, if ever, cited in the country of its origin as an authority on the common law of evidence. In that country its limitations are better understood. The book to which I refer was written by an English man of letters, rightfully of some renown in literature, and a respectable judge. It was composed as a tentative code of evidence for a foreign country. While not without great excellence in

the abstract, it is in reality a treatise on legal logic and on judicial reasoning rather than a serious treatise on the common law of evidence. Utterly at war with historical facts in its basic principles relating to the introduction or exclusion of evidence by the rules of common law, its currency in this country is fast leading to a refinement of discussion of points of evidence which is counter to the prior development of the very practical rules of the common law of evidence. The common law of evidence is an organic growth, really dependent wholly on precedent which defies system. The result of our reception of a scientific treatise as the basis of evidence is that purely logical problems are now attracting in our courts a degree of attention from lawyers which is without example in other common-law countries. What the end of this will be many thoughtful men and judges do not foresee. Evidence tends here to become the "metaphysics" of procedural law. It is estimated that there are half a million reported cases on points of the law of evidence alone.

But in this court in any event such discussions are anachronistic and out of place. Here the introduction of matter which is not evidence can do no real harm, while the erroneous exclusion of any evidential matter offered by the parties may do great injustice. This court does not proceed with trials from day to day, de die in diem, but adjourns over to suit the convenience of parties who therefore cannot be taken by surprise by any evidence received. The law commands that this court shall be always open. If error is here committed in the reception of evidence, it may be disregarded by the surrogate in the end, or by the Appellate Division, which now acts as the former ordinary to the surrogates, and thus no harm will ever ensue. Extreme technicalities of procedure, or harsh defaults, have no place in this court, devoted to the affairs of the dead, and possessed of its own ancient and simplified contentious procedure.

The Surrogates' Courts are by law vested with the oldest jurisdiction known to civilization and an instrument long ago perfected. This jurisdiction antedates the rise of all the so-called common law of evidence. Time does not permit me to demonstrate that even the most recent codifiers of this state detected this fact, and to some extent they respected the particularities and the jurisdiction of this court. But it is so. The pleadings here still are by the ancient citation, petition and by written objections, which differ entirely from the process and pleadings used in the other courts of justice of this state. This difference has a profound meaning. While some of the so-called general rules of evidence are no doubt binding here by statute, many of such rules are not really rules of evidence at all, but rules of the fundamental statute law. Thus the law requiring wills to be in writing is not a rule of evidence, but a rule of substantive law, and so it is with section 829, Code Civil Procedure, forbidding certain persons to testify to transactions with the dead. Although often spoken of in the terms of the law of evidence, these and like statutes are not related to the common law of evidence. But all such statutes are of course as binding here as elsewhere.

These remarks are not to be understood as reflecting in any way on

counsel in this cause, for their attitude has been as usual, respectful, just, and conciliatory to each other throughout the trial, as was to be expected. Such remarks are directed wholly to the system in vogue. My desire is that in this court, at least while I remain here, we shall have reference to realities and avoid technicalities, and that as few obstructions shall be made to the introduction of evidence as counsel are convinced by conscience and reflection is absolutely consistent with right. The surrogate is satisfied that the public business will thereby be enabled to flow better and that more exact justice to suitors will in the end be attained—and this, after all, is the only justification for the existence of particular forms of procedure in legal tribunals.

I revert now to the charges of conspiracy in this cause. It is no doubt a rule of law in actions founded on conspiracy that the declarations of co-conspirators are only evidence against one another when in the execution or the furtherance of the common purpose, and then only when prima facie grounds exist for believing in the conspiracy.

[15] Sometimes on a promise to connect them with a conspiracy such declarations are admitted by the court in advance of proof of the conspiracy, on a stipulation that they are to be stricken out if not so connected. That was the course here. As this was not a trial by jury, the surrogate could not be greatly influenced by the order of the proof or even by the wrongful introduction of such letters. But the contestant cannot quarrel with their reception, for she it was who insisted upon them.

[16] I do not think that the charge of conspiracy has been in any adequate way made out. The will itself cannot be assumed to be the proof of a conspiracy, for that would beg the whole question. Certainly no proof direct or indirect of an overt conspiracy has been given. Whether or not the letters of Miss Calvert to Mr. Kelly should now be stricken out, they seem to the surrogate so harmless as to amount to nothing as evidence, and if I had been for the proponents at the bar I venture to think that I should not have objected to them. Mr. Kelly was an old acquaintance of Mrs. Benjamin, and he evidently desired her to make a will, and he proposed and undertook to get her to do it. He was, I think, quite willing to be her executor, and even to take charge of her affairs during her life. His conduct is absolutely fatal to his evidence tending to show mental incompetency on the part of Mrs. Benjamin. He treated Mrs. Benjamin at all times as an intelligent being, and he accepted her gifts. For a long time Mr. Kelly conducted this correspondence with Miss Calvert, invited her confidence, promised to aid her, and he kept the evidence of it, or such as he thought made against her. He professed to have some influence with Mrs. Benjamin, although it is apparent in the end that he had very little. But on this assumption Miss Calvert gave him her confidence in an entirely respectful, decent way.

The testimony given by Mr. Kelly I do not quite understand. He was an old acquaintance of Mrs. Benjamin. But why he should have conducted this long correspondence with Miss Calvert, whom on the stand he wrongfully characterizes as Mrs. Benjamin's servant, is incomprehensible. He was a man with a family and affairs of his own,

and he was no relation to Mrs. Benjamin. But I do understand that when Mrs. Knapp approached him after Mrs. Benjamin's death he at first denied in substance that he knew of Mrs. Benjamin's death, although he had just been at her funeral. He does not deny this on the stand, but explains it as proper caution on his part with a stranger. To the surrogate it seems that Mr. Kelly confesses he was guilty of a departure from strict truth in this statement, and this without provocation or justification. But on other grounds the surrogate can attach no importance to Mr. Kelly's opinion that any act of Mrs. Benjamin's was irrational. His conduct and dealings with Mrs. Benjamin established that he regarded her as rational. Here his conduct and his words are again at variance.

But what is it that these much objected to letters of Miss Calvert's prove, if they are admitted in evidence? They certainly do make out that Miss Calvert desired Mrs. Benjamin to make a will, but also that without the aid of Mr. Kelly she despaired of ever accomplishing it. Thus these letters her counsel object to really tend to disprove the possession of the wrong influence with which Miss Calvert is charged. They prove her case.

[17] As Miss Calvert was no longer young, and had long been the companion and dependent of Mrs. Benjamin, and had lived for years intimately and affectionately with her in the same family and under the same roof, devoting to Mrs. Benjamin, decently and in order, that care and oversight which Mrs. Benjamin's physical impairments required, this desire on the part of Miss Calvert was not in itself wrong. The law tolerates reasonable approaches to a testatrix for a testamentary provision under such circumstances. Blanchard v. Nestle, 3 Denio, 37; Tunison v. Tunison, 4 Bradf. Sur. 138; Hazard v. Hefford, 2 Hun, 445; Wait v. Breeze, 18 Hun, 403; 1 Redf. Wills, 430. But the law on this head is so entirely settled that it needs no further discussion.

[18] Mere opportunity to exercise undue influence, standing alone, is not enough (Cudney v. Cudney, 68 N. Y. 148, 152), and I see in the cause no sufficient evidence that this will was the offspring of that masterful power and authority of another over the testatrix, which alone the law, in its great wisdom and justice, terms "undue influence." In fact, I see the contrary. Mrs. Benjamin was an extremely hardheaded and even obstinate woman to deal with. She liked the attentions which her old acquaintance Mr. Kelly bestowed on her invalidism, but she rejected his offers to take charge of her estate or to act as her executor on his own terms. It appears that he had a very decided opinion what Mrs. Benjamin's will should contain.

[19] I come at last to consider the effect of the gift by testatrix to the physician. Testamentary gifts by will to those occupying confidential relations to testators are to be subjected to great scrutiny in this court, and sometimes the burden is imposed on such persons to explain the circumstances, with more or less particularity as the facts of each case justly demand. I shall always, while in this court, view with suspicion, at first, testamentary gifts to lawyers or gifts to any other person occupying a confidential relation towards helpless testators. This

is required of the surrogate by the long-established law applicable to wills made under such circumstances. But there is no hard and fast rule which prevents such legacies. Circumstances may make such gifts eminently proper and entirely natural. The existence of a professional relation is in every case by no means sufficient evidence in itself of undue influence. Matter of Small, 105 App. Div. 140, 93 N. Y. Supp. 1065; Post v. Mason, 91 N. Y. 539, 43 Am. Rep. 689; Matter of Suydam, 84 Hun, 514, 32 N. Y. Supp. 449; Clarke v. Schell, 84 Hun, 28, 31 N. Y. Supp. 1053. In some such cases the burden of establishing with great particularity that the will was a deliberate and conscious act of the testator may be cast on such beneficiaries. Matter of will of Smith, 95 N. Y. 516; Paske v. Ollat, 2 Phillimore, 323; 1 Jarman on Wills, p. 69 (6th Ed.).

[20] But that is all that the law demands in such cases. Here the not great residuary legacy to her physician of years standing, and to Miss Calvert, the faithful dependent of her household, cannot be regarded as wholly unnatural under the circumstances of Mrs. Benjamin's isolated life.

Mrs. Benjamin, at her death, left no children or husband, no brother or sister, and no parent. She left in fact no one nearer than the contesting cousin, whom she would not or did not see. Why under such exceptional circumstances should not Mrs. Benjamin do what she willed with her own? Had she chosen to burn up her property, censure from relatives would not be much heeded, so free was Mrs. Benjamin from the natural claims of kindred. Under the conditions of Mrs. Benjamin's life I cannot say that her legacies to her faithful attendant and to her friend and physician are so unnatural on their face as to cast even suspicion on her testamentary capacity. The legacy to Miss Calvert constitutes only a very moderate provision for her during her life. I will take notice that the legacy to her physician is not greater in the aggregate than the charges of some professional men of eminence for a single professional employment, although I will not consider this fact as the basis of my conclusions.

If Mrs. Benjamin had testamentary capacity, as I have already found, and if the preparation and the execution of her will were her deliberate and unrestrained act, as I have also found (for they were done with gravity and attention), I am constrained in duty to pronounce for her will, and the findings and the decree herein may so provide. No costs, however, will be allowed in this matter.