DAVID F. DOBIE, Individually and as Executor, etc., of THOMAS ARMSTRONG, Deceased, and Others, Respondents, *v.* EMMETT ARMSTRONG, Appellant, Impleaded with HARRIET H. ARMSTRONG.

*Will — conflicting opinions of experts as to the capacity of the testator — when they do not require the submission of the case to the jury — insufficient proof of testamentary incapacity.*

The conflicting opinions of experts, in respect to the sanity of a testator, given in answer to hypothetical questions based on acts and expressions separated from each other by years, but so united in the question that they apparently represent a continuing state of mind, and upon assumed and isolated facts, covering a long lifetime, about which facts the experts have no personal knowledge, and many of which assumptions rest upon very slight evidence and might not be sustained by the jury, do not present a question of fact for the jury.

What evidence, adduced in an action brought to determine the validity of the probate of a will, is insufficient to show mental incapacity on the part of the testator, a man who for fifty years occupied a prominent position in the community in which he lived, succeeded in his professional and business affairs and amassed a considerable property, which he managed without aid until his death, and the bulk of which he bequeathed by a will, written by himself, to educational purposes, in fulfillment of a plan which he had cherished for several years, considered.

GREEN and WARD, JJ., dissented.

APPEAL by the defendant, Emmett Armstrong, from a judgment of the Supreme Court in favor of the plaintiffs, entered in the office of the clerk of the county of Clinton on the 13th day of January, 1897, upon the verdict of a jury rendered by direction of the court, establishing the validity of the probate of the last will and testament of Thomas Armstrong, deceased, with notice of an intention to bring up for review upon such appeal an order bearing date the 18th day of November, 1896, and entered in said clerk's office, denying the defendant's motion for a new trial made upon the minutes.

This appeal was transferred from the third department to the fourth department.

*Thomas F. Conway,* for the appellant.

*Richard L. Hand,* for the respondents.

FOLLETT, J.:

December 31, 1895, Thomas Armstrong, of Plattsburgh, N. Y., died leaving a last will and testament relating to real and personal property, which was admitted to probate in the Surrogate's Court of Clinton county May 8, 1896, and letters testamentary were issued thereon to the executor nominated in the will. The testator left but one descendant, a son, Emmett Armstrong, who appeared and contested, in the Surrogate's Court, the validity of his father's will on the ground that he was insane and not possessed of sufficient mental capacity to make a will. So far as it appears, the testator left no ancestor nor any collateral relative him surviving. The defendant, Harriet Armstrong, was formerly the wife of Thomas Armstrong, but they were divorced June 18, 1887, by a judgment of the District Court of the Territory of Dakota, rendered in an action in which he was plaintiff and in which she appeared and interposed a defense. The present action was begun May 27, 1896, pursuant to section 2653a of the Code of Civil Procedure, to determine the validity of the probate of the will. Both of the defendants answered, alleging the invalidity of the probate upon the ground that the testator was not of sound and disposing mind when the will was executed. Upon the issue so joined the action was tried before a jury, and upon the conclusion of the trial the court directed the jury to find that the probate of the will was valid, upon which verdict a judgment was entered declaring the validity of the probate.

But a single issue was tried before the jury, which was whether the testator was competent to make a will; and but one point is presented by the appellant as a ground for the reversal of the judgment, which is, that the evidence was sufficient to raise a question of fact as to the capacity of the testator, and that the court erred in directing the verdict. It will be quite impossible to review in an opinion the evidence in this case, which occupies more than 1,300 pages, and I must content myself with stating the conclusions reached, with brief reasons for them.

The section under which this action was brought was enacted in 1892, amended in 1896, and again in 1897, and is designed to enable persons interested in a will, or in an estate attempted to be disposed of by a will, to set at rest early and for all time the question whether it is valid or invalid.

The section provides that " On the trial of such issue the decree of the surrogate admitting the will or codicil to probate shall be prima facie evidence of the due attestation, execution and validity of such will or codicil. * * * The party sustaining the will shall be entitled to open and close the evidence and argument. He shall offer the will in probate (evidence) and rest. The other party shall then offer his evidence. The party sustaining the will shall then offer his other evidence, and rebutting testimony may be offered as in other cases."

Under these provisions it is clear, I think, that the burden of establishing the incompetency of the testator to execute his will was upon the defendants.

On the trial of this action Harriet Armstrong disclaimed all interest in the estate of the testator, and the defendants offered in evidence an exemplified copy of a judgment of a District Court of Dakota annulling the marriage and divorcing the testator and Harriet Armstrong. All the litigants seem to concede the validity of that judgment, and the trial was conducted on the theory that by it the testator and Harriet Armstrong ceased to be husband and wife on the 12th of April, 1887. After the disclaimer was made in open court and the judgment of divorce read in evidence by the defendants, Harriet Armstrong was permitted to testify to personal transactions with the testator.

The evidence shows that the testator was born in 1819 in Ireland, where his father died when the testator was very young, and that, shortly after, he and his mother emigrated to Montreal, Canada, where he was apprenticed to a tailor. A few years afterwards he ran away from Canada and became a resident of the State of Vermont, and there worked at his trade and as a common laborer. Harriet Hill was born in Vermont November 10, 1822, and she and the testator intermarried April 24, 1842. They continued to reside in Vermont, he working at his trade, engaged in other occupations and reading law until 1847, when they removed to the county of Clinton in this State, where he continued to reside until his death. At some time, apparently about 1848, he was admitted to the bar of this State and practiced for ten or twelve years at Mooers. From January 1, 1851, to December 31, 1853, he was the district attorney of his county. About 1860 he removed to Plattsburgh, where he continued to

reside until his death. For some time he served in the army as colonel of the One Hundred and Fifty-third regiment of New York Volunteers. He was a practicing lawyer having a large business, from which, and dealing in real estate, he accumulated an estate valued at about $250,000, which he managed and controlled without aid until his death. The record shows that he was a man of unusual ability, and managed his affairs with sagacity and success.

Emmett Armstrong, the son, was born April 19, 1848, and, at the death of his father, was unmarried and upwards of forty-seven years of age. The son was educated at Union College and in Germany, traveled extensively in Europe, in the United States and Mexico, at the expense of his father, who took great interest in his education, and apparently entertained great hopes of his success in life; but in this he was bitterly disappointed. The son, very early in life, contracted intemperate habits, which have continued, and it is clearly established that he has become an improvident person, without occupation, who contributes nothing to his own support and never has. An estrangement arose between the father and son by reason of the habits of the latter. The mother espoused the cause of the son, and from their disagreements in respect to the son unhappy differences arose between the husband and wife, and, in January, 1882, they ceased to live together. March 1, 1882, she brought an action against him for a limited divorce, on the ground of cruelty and neglect to provide for her. He appeared and answered, denying the allegations in the complaint. In 1882 he began an action against her for divorce in Dakota, and, February 1, 1883, a judgment of divorce was entered in that action by default. In July, 1884, she began an action for an absolute divorce, in which he appeared and denied the allegations in the complaint. In this action motions and counter-motions were made, resulting in appeals to the General Term and to the Court of Appeals. December 23, 1886, they entered into an agreement by which the judgment of divorce in Dakota was to be opened, she to appear in the action which was to be tried, and, in case a judgment of divorce should be finally rendered, it should provide for the payment to her, as alimony and in lieu of dower, of a sum not less than $15,000. The result was that the Dakota judgment of divorce, entered February 1, 1883, was opened. Mrs. Armstrong appeared in the action and answered, and

after a trial a final judgment was entered April 12, 1887, dissolving the marriage and providing for the payment of $15,000 to Mrs. Armstrong, which sum, after some further litigation, was paid ; and thereupon Mrs. Armstrong removed to Steelton, Pennsylvania, and invested this sum in tenement houses, from the income of which she has since supported herself and son, who has resided with her. In these litigations between Mr. and Mrs. Armstrong the son was a bitter and active partisan of the mother. The letters which he wrote to his uncle and to others show a bitterness of spirit not often evinced by the most unfilial child towards a parent. In March, 1889, the testator and a Mrs. Deborah Lewis, formerly Bromley, intermarried. They lived together until December 25, 1895, when she died, and six days thereafter he died.

October 7, 1890, Thomas Armstrong conveyed real estate having an annual rental value of about $6,650 to Union College, the income of which was to be applied to the support of students in the college who should be sons of practical farmers residing in the county of Clinton. The students who were to receive the bounty were to be recommended by the board of supervisors of the county of Clinton. March 26, 1891, a second deed of the property was executed by himself and wife to Union College, which recited that the college had covenanted and agreed to pay the sum of $1,000 per year, in quarterly yearly installments, to Deborah L. Armstrong during her life. This agreement and the second deed were evidently executed to secure the release of the inchoate right of dower of Mrs. Armstrong. March 9, 1893, the testator wrote with his own hand a will, by which, after making some small personal bequests, he bequeathed the residue of his estate to Union College for the purpose of establishing prizes for theses on certain subjects, and to establish scholarships for the sons of farmers and workingmen who were residents of Clinton county. Afterwards he executed a codicil. In this will he gave his wife an annual income of $1,000, payable quarterly, which, with the provision in the deed, gave her an annual income of $2,000. May 15, 1895, he executed a second will, by which he devised and bequeathed some small legacies and the remainder of his estate to Union College, the income therefrom to be devoted to paying prizes for theses on certain subjects by students in the law school and the remainder for the purpose of establishing

scholarships in the college for the sons of farmers and workingmen residing in the county of Clinton. By the residuary clause he devised and bequeathed the remainder of his estate, not before legally devised, to Judson S. Landon, of Schenectady, a trustee of Union College, and to Andrew V. V. Raymond, the president of the college, or to the survivor of them. These were the three papers which were admitted to probate.

After reading all the evidence, oral and documentary, I am persuaded that it utterly fails to make out a *prima facie* case of incompetency on the part of the testator. After the judgment was entered divorcing him from his wife, she and her son left the State, and neither of them afterwards saw him. Shortly after his marriage to his second wife he conceived the idea of giving his estate for educational purposes, and this idea seems, from the correspondence in the record, to have been constantly in mind and was carried out.

The letters between the testator and Judge Landon, disclosing his purpose to give a large part of his estate to Union College and considering how best to accomplish it, which correspondence extended through several years, shows that he formed his design about 1889, and that he never swerved nor departed from his purpose. The letters are clear, lawyerlike, and contain no evidence of unsoundness of mind, but, on the contrary, strength of intellect and firmness of purpose.

The record contains letters and documents written by the testator during the last years of his life, and in none of them, save one or two written a few days before his death, do I find evidence of weakness of intellect; but, on the contrary, they disclose that he was possessed of a strong mind and a determined will. The will was not the result of a sudden impulse, but of a definite purpose formed several years before it was executed and persisted in until his death.

The fact that he made no provision for his divorced wife or for his son was not unnatural, and, under the circumstances, was not the slightest evidence of unsoundness of mind. The relations existing between him and his former wife were dissolved, she, not he, taking the first steps to bring about a dissolution. He labored under no delusion as to his divorced wife or his son.

There is much evidence in the case that the testator was of a passionate temperament, and, when excited, made use of extravagant expressions indicating anger and hatred. He was opinionated and proud, but I fail to find in this record, prior to the last weeks of his life, a single act, read in the light of the circumstances surrounding it, which indicates that he was of unsound mind and incapable of disposing of his estate. The opinion delivered by the learned trial judge at the close of the evidence, when the verdict was directed, is a clear and sufficient discussion of the facts in this case, of which but a meagre outline is given in this opinion, and discloses, as I think, sufficient reasons for affirming the judgment entered upon his direction.

It is suggested that, because two physicians, experts, expressed the opinion that if the statements in the hypothetical questions were facts, the testator was of unsound mind, there was a question of fact raised for the jury. The answers of the experts to the hypothetical questions put by the defendant's counsel are utterly insufficient to raise even a slight presumption that the testator was insane at any time during his long life. He resided in Clinton county for fifty years, and during all the time was one of its conspicuous citizens and constantly before the public. He was a man of great determination of character, of strong convictions, and fearless in the expression of his opinions upon all subjects, public and private. Concealment of his thoughts and opinions seems to have formed no part of his nature. It would seem that every angry expression, and every controversy with his employees and those with whom he dealt, and every instance of sleeplessness, nervousness and forgetfulness during the last few years of his life, when his strength was failing, was proved and relied on as evidence of insanity. The hypothetical questions embraced acts and expressions separated from each other by years, but so united in the question as to make it appear that they represented a continuing state of mind. Many of the assumptions rested upon very slight evidence, and had they been submitted to a jury it is doubtful if they would have been found to be established. The experience of the courts has demonstrated that the answers of experts, though honestly given, to hypothetical questions embracing pages of assumed and isolated facts covering a long lifetime, about which facts the experts have no per-

sonal knowledge, are the weakest and most unreliable kind of evidence in respect to the sanity or insanity of the person inquired about.

*Hawke* v. *Hawke* (82 Hun, 439; affd., 146 N. Y. 366) was an action brought under section 2653a of the Code of Civil Procedure to test the validity of the probate of a will. The question involved was whether the testator had testamentary capacity. In that case, as in this, two physicians testified that in case the statements contained in the hypothetical questions were true, they believed the testator to have been insane. Notwithstanding, the jury was directed to find that the probate of the will was valid. Upon an appeal the General Term upheld the judgment, notwithstanding the evidence of the experts, one justice dissenting on the ground that the opinion of the experts presented a question of fact which should have been submitted to the jury. An appeal was taken to the Court of Appeals, where the judgment was affirmed, thus settling the question that in such a case the conflicting opinions of experts do not necessarily present a question of fact for the jury.

The judgment should be affirmed, with costs.

All concurred, except GREEN and WARD, JJ., dissenting on the ground that there was a question of fact which ought to have been submitted to the jury.

Judgment and order affirmed with costs.