In the Matter of Proving the Will of JENNIE H. HEATON, Deceased.

JACOB H. CROPLEY, as Executor, Appellant; CHARLES A. HEATON et al., Respondents.

**Will — evidence of habitual and extreme intoxication of testatrix and that she held delusions, not sufficient in itself to prove unsound mind or testamentary incapacity — insufficiency of evidence to warrant finding that testatrix was of unsound mind.**

1. Habitual and extreme intoxication is not in and of itself evidence of or does not constitute an unsound mind or testamentary incapacity. There must be the additional proof that at the time of the testamentary disposition the natural intelligence, memory and judgment were paralyzed or perverted or the power of volition inactive because of the intoxication.

2. The holding of delusions does not in and of itself constitute testamentary incapacity. There may co-exist delusion and a sound and disposing mind. A delusion affects testamentary capacity only when it enters into or controls in some degree its exercise.

3. On this proceeding for probate of the will of decedent the record does not disclose any evidence that intemperance and disease had so impaired or denatured her mind that she was incapable, when not drunk, of knowing the extent and value of her property, of knowing her relatives and all the relations between them, and of having a fixed wish and a judgment in the disposition of her property, or had so impoverished her memory that she could not collect in her mind, without prompting, the particulars or elements of the business to be transacted, and to hold them in her mind a sufficient length of time to perceive, at least, their obvious relations to each other. A person who had sufficient mental power to do those things is, within the meaning and intent of the law, of sound mind and competent

to dispose of his estate by will. Nor is there any evidence of a fixed, continuing and universal insanity or incapacity or supporting the finding that the deceased was of unsound mind. (*Delafield* v. *Parish*, 25 N. Y. 9; *Matter of Will of Snelling*, 136 N. Y. 515, followed.) *Mat'er of Heaton*, 179 App. Div. 885, reversed.

(Argued April 22, 1918; decided May 28, 1918.)

APPEAL from an order of the Appellate Division of the Supreme Court in the first judicial department, entered June. 8, 1917, which affirmed a decree of the. New York County Surrogate's Court, rendered upon a verdict, denying probate to a paper propounded as the last will and testament of Jennie H. Heaton, deceased.

The facts, so far as material, are stated in the opinion.

*Arnold L. Davis* for appellant. The evidence did not warrant submission to the jury of the question of incompetency. (*Peck* v. *Cary*, 27 N. Y. 9; *Matter of Woolsey*, 17 Misc. Rep. 467; *Matter of Halbert*, 15 Misc. Rep. 308; *Matter of Johnson*, 7 Misc. Rep. 220; *Matter of Feeney*, 55 Misc. Rep. 158; 1 Heaton on Surr. Prac. 58; 1 Jessup on Surr. Prac. 441; *Matter of Sutherland*, 28 Misc. Rep. 424; *Cook* v. *White*, 43 App. Div. 388; *Van Wyck* v. *Brasher*, 81 N. Y. 260; *Matter of Johnson*, 17 Misc. Rep. 220; *Wadsworth* v. *Sharpsteen*, 8 N. Y. 388; *Ivison* v. *Ivison*, 80 App. Div. 599; *Matter of Coe*, 47 App. Div. 177; *Matter of Sutherland*, 28 Misc. Rep. .427; *Rollwagen* v. *Rollwagen*, 63 N. Y. 504.) If the testatrix suffered from any delusions they did not influence her testamentary action. (*Matter of Forman*, 54 Barb. 274; *Van Guysling* v. *Van Kuren*, 35 N. Y. 70; *Matter of White*, 121 N. Y. 406; *Society* v. *Hopper*, 33 N. Y. 624; *Matter of Iredale*, 53 App. Div. 45; *Buchanan* v. *Belsey*, 65 App. Div. 58; *Dobie* v. *Armstrong*, 160 N. Y. 584; *James* v. *Hughes*, 15 Abb. [N. C.] 141.)

*James W. Prendergast* and *Stephen P. Anderton* for respondents. The issue of competency involved conflict-

ing evidence, the weight of which is not reviewable in this court. Beyond question, there was some evidence of incompetency. (*Rollwagen* v. *Rollwagen*, 63 N. Y. 504; *Matter of Snelling*, 136 N. Y. 515; *Ivison* v. *Ivison*, 80 App. Div. 599; *Peck* v. *Cary*, 27 N. Y. 9; *Delafield* v. *Parish*, 25 N. Y. 9; *Seamen's Friend Society* v. *Hopper*, 33 N. Y. 619; *Matter of Gidney*, 142 N. Y. Supp. 157.)

COLLIN, J. The only question meriting discussion presented by this appeal is, is there any evidence supporting the finding that the deceased was not of sound mind when she executed the paper propounded as her last will and testament.

The paper was executed December 11, 1914. It gave to each of a niece and an aunt the sum of one dollar, with the statement: " I make no other or further disposition for their benefit because of their cold and indifferent attitude toward me." It gave to her husband, Charles Albert Heaton, to whom she was married in 1897, the sum of one hundred dollars, with the statement: " I make no other or further disposition for his benefit for the reason that he is already well provided for." There followed the provision: " I give, devise and bequeath all the rest, residue and remainder of my estate, both real and personal, and of every kind and nature whatsoever, and whether now possessed by me or which I may hereafter be entitled to receive, whether by will or otherwise, to my best and truest friend, Jacob Howard Cropley," who was named as executor. The deceased left no descendant. Cropley, named as executor, is the proponent for the probate of the paper, and the niece and the husband are the contestants.

The deceased died June 12, 1915. The immediate cause of her death was chronic alcoholism. The contributing causes were arterio sclerosis, cirrhosis of the liver and dropsy. Her age was thirty-eight years. The

1918.] Opinion, per COLLIN, J. [224 N. Y.]

two witnesses of the execution of the paper gave the proof which entitled it to probate. The contestants did not introduce direct evidence that the deceased was when executing the paper under the influence of intoxicating liquors or any delusion. They sought to sustain by evidence a finding that she at that time was suffering from fixed and general alcoholic dementia, accompanied by delusions which affected the disposition of her property. They proved that prior to December, 1912, she had been and thereafter until a few weeks before her death was an immoderate and inordinate drinker of intoxicating liquors of various kinds. Throughout such period, excepting, however, a few months at its beginning while she was taking and under the effect of treatment for alcoholism, she was habitually drunk. As a rule, the exceptions to which were rare and brief, she was attended and accompanied by a maid or nurse. In July, 1914, Cropley, the proponent here, became and continued to be until her death, except through a few weeks in the early autumn of 1914, her secretary and adviser. Her husband, who lived at a sanitarium, paid her each month as her personal allowance three hundred and seventy-five dollars. From May, 1914, to July 5, 1914, she lived in a hotel or in hotels at South Norwalk, Connecticut, to be near her husband, who was there in a sanitarium. Through July and the first part of August, 1914, she, her husband and Cropley lived at hotels in New York city. The three weeks next following, she, accompanied by Cropley, and not by a maid or nurse, lived at a hotel in the Catskills. The deceased and Cropley returned from the Catskills to a hotel in New York. Soon they and a maid for Mrs. Heaton went to and remained through a week or ten days at a hotel at White Plains. Through the fourteen months intervening the return to New York and her death, she lived in hotels or boarding houses in that city, except in the months of February

and March, 1915, she with a nurse and Cropley were at a hotel at Jacksonville, Florida. A physician, who visited the deceased professionally in December, 1912, testified: "I found Mrs. Heaton mentally upset and excited; her speech was blurred; her conversation was disjointed and she was unable to carry on a connected conversation. She had delusions about herself and about her husband; especially delusions relating to every man being in love with her and of that sexual type. Physically, she was rather stout. Her face was bloated; her eyes were blood shot; her speech was thick. She had a very large cirrhotic liver. She had a poor, degenerated heart and her circulation was not in good equilibrium. * * * She was of unsound mentality. She was full of delusions; she was unsound. She had alcoholic dementia. Her mind was demented. * * * She was unsound because her daily existence was influenced by a lot of sexual delusions and those delusions are too intimately connected with her every day life not to influence her entire life. She would not carry on any line of conversation connectedly. She would jump off on this and that so that her mind was without control. It was the unsound mind. She would answer sensibly whether it was a pleasant day or not. You cannot say every idea was unsound. * * * I found delusions about her husband and delusions about herself. Generally describing them, they related to the sexual topic. She was demented; it was incurable. Dementia is incurable." Under his direction, she entered and remained at a hospital through the period of ten days or two weeks, taking there the belladonna treatment for alcoholism. "The result was that she had no physical desire for her alcohol after she got through; she was much less nervous. She could talk accurately as far as enunciations were concerned. She still retained these delusions. She still had hard work to carry on a conversation with any

continuity of thought." He talked with her in March or February, 1913, and testified: " She would not talk connectedly with you; I could· not get her to talk. I tried to get her to talk. I tried to get her to talk to see how she was doing but she evaded the issue every time. I could not get any connected conversation with her. She told me that she had gone back to taking alcohol." A physician testified that in May, 1914, the deceased's skin was white and pasty; she had protruding eyes and dilating pupils; in walking she shuffled and bent forward and in her dress she was slovenly. A physician, who visited her professionally August 12, 1914, while in the Catskills, testified that she was intoxicated; that when he tried to see her features she would struggle against it, was agitated and not quiet enough to be examined; he gave her sedatives and made the examination. She then quieted down somewhat but occasionally would fall into a delirious condition, a condition of agitation, trembling, mumbling and talking incoherently, expressing regular· hallucinations, expressed by him thus: " She would like to go to New York; that somebody or something keeps her back; that her money is used up to leave her in the cold; ' There is something in me, something strange, I don't know where it is ; ' wants to see her mother or father; wants to go back to New York; curses her nephew who got married in order to take her money away." A physician, who had three or four conversations with the deceased in May and June, 1914, testified that she was nervous and would go from one subject to another and ramble away incoherently; that was characteristic of all the conversations he had with her. In August, 1914, she had Bright's disease, a hardening of the arteries and high blood pressure. In October or November, 1914, she was afflicted with dropsy, enlarged heart, enlarged and cirrhotic liver and arterio sclerosis. While in the Catskills, she went horseback riding two or

three times, mounting the horse " very gracefully " from a step ten or twelve inches high. In October or November, 1914, to a physician who advised her to go to a sanitarium, she declined the advice saying she did not need to go. She had a bank account and signed all the checks upon it. In many instances narrated by contestants' witnesses she gave directions to her maid or to Cropley. In other instances she declined to follow or adopt suggestions, requests or directions made to her and in other instances carried on conversations. The statements made in the propounded will relative to her relatives and the financial condition of her husband were true. Between November 1, 1914, and December 11, 1914, she with her own hand and unaided drew one or more wills disposing of her property substantially as does that propounded.

The contestants' evidence fills nearly three hundred pages of the record. It tends to prove facts other than those we have narrated and which are included in it. It considered as a whole or in any part does not surpass the facts we have stated in the probative effect of supporting the finding that the deceased was of unsound mind. If those narrated facts do not directly or through reasonable inference support the finding, the record is devoid of support of it.

The evidence of the contestants fails utterly to prove that Mrs. Heaton at the time she executed the paper here was not capable mentally of knowing and remembering who were her relatives or her relationship or responsibility to them; indeed it tends to prove affirmatively that she was capable of possessing at all times when her mind was not overwhelmed with drink complete and active knowledge and recollection in those respects. It likewise fails utterly to prove that she at that time was mentally incapable of forming a decision as to the disposition of her property and of recollecting the decision

throughout the disposition of it; indeed it begets a contrary conviction. Habitual and extreme intoxication is not in and of itself evidence of or does not constitute an unsound mind or testamentary incapacity. There must be the additional proof that at the time of the testamentary disposition the natural intelligence, memory and judgment were paralyzed or perverted or the power of volition inactive because of the intoxication. (*Peck* v. *Cary*, 27 N. Y. 9; *Van Wyck* v. *Brasher*, 81 N. Y. 260.) Such proof is wholly lacking. Testimony of the grossly intemperate habit of the deceased has weight, under the evidence here, only as proof of one fact among others useful in reaching a true understanding in regard to her ability to make the efforts of the mind and memory requisite to have and carry out a sound choice or wish in the disposition of her property.

The holding of delusions does not in and of itself constitute testamentary incapacity. There may co-exist delusion and a disposing mind. A delusion affects testamentary capacity only when it enters into or controls in some degree its exercise. (*Dobie* v. *Armstrong*, 160 N. Y. 584; *Middleditch* v. *Williams*, 45 N. J. Eq. 726; *Shreiner* v. *Shreiner*, 178 Penn. St. 57.) Giving the evidence of the contestants its fullest legitimate vigor and effect, it falls far short of proving that Mrs. Heaton held any delusion which to any extent influenced her in executing the propounded instrument. It does not tend to prove that any delusion at any time entered into or influenced her conduct or action.

We do not discover in this record any evidence that intemperance and disease had so impaired or denatured the mind of Mrs. Heaton that she was incapable, when not drunk, of knowing the extent and value of her property, of knowing her relatives and all the relations between them, and of having a fixed wish and a judgment in the disposition of her property; or had so

impoverished her memory that she could not collect in her mind, without prompting, the particulars or elements of the business to be transacted, and to hold them in her mind a sufficient length of time to perceive, at least, their obvious relations to each other. A person who has sufficient mental power to do those things is, within the meaning and intent of the law, of sound mind and competent to dispose of his estate by will. (*Delafield v. Parish*, 25 N. Y. 9; *Matter of Will of Snelling*, 136 N. Y. 515.) Nor can we discover any evidence of a fixed, continuing and universal insanity or incapacity. There is no evidence supporting the finding that the deceased was of unsound mind.

The order of the Appellate Division and the decree of the Surrogate's Court should be reversed and the proceeding remitted to the Surrogate's Court for a rehearing, with costs to the appellant in the Appellate Division and this court, payable out of the estate.

HISCOCK, Ch. J., CHASE, CUDDEBACK, CARDOZO and McLAUGHLIN, JJ., concur; HOGAN, J., not voting.

Order reversed, etc.