In the Matter of the Petition of WILLIAM J. AMEND to Prove the Last Will and Testament of JULIA F. MEADE, etc., Deceased.

WILLIAM J. AMEND and Others, Appellants; CHARLES F. MEADE, Respondent.

Second Department, March 17, 1922.

**Wills — probate — lack of testamentary capacity not shown.**

In proceedings to probate a will which was contested on the ground that the testatrix did not have testamentary capacity, it appeared that at the time the will was executed, which was more than seven years before the death of the testatrix, she was past seventy years of age; that she gave to her attorney prior to the execution of the will a detailed statement of her bequests, the amount and character of her property, and a list of her relatives; that she specifically stated that she did not wish to give anything to the contestant, and that prior to and after the execution of the will the testatrix managed her own property and attended to her own financial affairs without assistance other than legal advice.

*Held,* on all the evidence, that the testatrix manifested a clear knowledge of the nature and extent of her property, knew the relation she bore to those who would be the natural objects of her bounty, and knew and understood what she was doing when she executed the will, and, therefore, the verdict of the jury to the effect that she did not possess testamentary capacity was against the weight of the evidence and it should be set aside and the will admitted to probate.

APPEAL by William J. Amend and others from a decree of the Surrogate's Court of the county of Queens, entered in the office

of said Surrogate's Court on the 16th day of May, 1921, after a trial by a jury, denying probate to the paper writing propounded as the last will and testament of Julia F. Meade, and also from an order entered in said office on the same day denying the appellants' motion for a new trial made upon the minutes.

*John E. Donnelly*, for the appellant William J. Amend.

*Patrick E. Callahan* [*Michael F. McGoldrick* with him on the brief], for the appellants St. Cecilia's Church and Edward J. McGolrick.

*Herbert T. Ketcham* [*Samuel E. Neumann* with him on the brief], for the respondent.

MANNING, J.:

As against the petition for probate, the contestant, a nephew of the deceased, interposed the usual objections denying due execution of the will and codicil, asserting undue influence and also lack of testamentary capacity. The charge of undue influence was abandoned during the trial, leaving to the jury two questions only, *first*, as to the due execution of the instruments propounded; and *second*, as to the testamentary capacity of the decedent. The jury found that both instruments were executed according to the statute (Decedent Estate Law, § 21), but found that the decedent lacked testamentary capacity. From the decree entered refusing probate the proponent and certain legatees appeal to this court, their main contention being that testamentary capacity was clearly proved, and that the finding of the jury and the decree entered thereon are against the evidence and the weight of the evidence.

A reading of the record in this case will, I think, justify the claim thus made; and hence, it will naturally follow that the decree refusing probate on the ground of lack of testamentary capacity must be set aside.

The decedent, Julia F. Meade, at the time of her death on July 8, 1920, was about seventy-eight years old. She had never married, and her only heirs at law and next of kin are two nieces, who are Sisters of Charity; and one nephew, the contestant. The nieces took no part in the proceeding, though their position was evidently favorable to that of the contestant, for the record shows that they assigned all their right, title and interest in and to the estate to him. At the date of her death Miss Meade owned and lived in a three-story house, known as No. 581 Morgan avenue, Brooklyn, occupying the second floor herself, and renting out the first and third floors. She had resided in this same place for many years, and it was in this house that she died. The will in controversy was executed

by her on the 4th day of June, 1913; and on the 30th day of June, 1914, she executed the codicil. It will be seen, therefore, that the instruments are not what is known as "death bed testaments," the will having been executed over seven years and the codicil over six years prior to the decedent's death. Her estate is conceded as amounting to about $31,000, and consists of both real and personal property. By the provisions of the will certain personal property consisting of household effects, wearing apparel and jewelry were given to the Home for the Aged of the Little Sisters of the Poor. A certain trust fund of $3,000, of which she had the power of disposition, is given to St. Cecilia's Roman Catholic Church in Brooklyn. A direction to convert the remainder of her estate into cash is followed by a legacy of $500 to the trustees of St. Patrick's Cathedral for the care of the grave of her deceased brother, in which plot she desired her own remains to be interred. She gave to St. Cecilia's Church a sum of $500 for masses for the repose of her soul. She gave a legacy of $100 to the Xavier Free Publication Society for the Blind of the city of New York; and also a legacy of $300 to the Convent of the Dominican Sisters of the Perpetual Rosary of West Hoboken, N. J.; $300 to St. Joseph's Home, of Jersey City, N. J.; and the residue of her estate she gave to St. Cecilia's Roman Catholic Church, and appointed its pastor, Very Reverend Monsignor McGolrick, and one David Glinnen as her executors.

The codicil makes no changes in the will, merely naming an executor in the place of Mr. Glinnen, who had died.

The will was prepared by William J. Amend, a reputable member of the New York bar, who had been decedent's lawyer for some seventeen years before her death. His statement as to the circumstances concerning the making of the will is not disputed, and is substantially as follows: On May 13, 1913, the decedent called at his office in New York city, and stated that she wanted him to prepare her last will and testament. He asked for instructions concerning the matter and she gave them to him. He committed these items to writing in the form of a memorandum, which is in evidence in the case. Mr. Amend says that he had no previous personal knowledge concerning the facts set forth in the memorandum and that the information therein contained was given him by Miss Meade. An examination of this memorandum discloses, in the light of the evidence in this record, that the only error which appears is as to the matter of the decedent's age. She gave it as over sixty-five, while the fact was that she was over seventy. I see nothing unusual in this, however. When inquiry is made concerning a woman's age, the subject is somewhat delicate, often

embarrassing and generally considered impertinent. Hence the statement that she made was entirely sufficient under the circumstances. It is a matter of common knowledge that most people, men as well as women, are not strictly accurate in giving their correct age, and hence the incident criticised, as it is here, seems very unimportant, and certainly would not be regarded as any evidence of an unsound mind. The decedent stated that she was born in County Meade (probably Meath), Ireland; and that she had been in this country fifty-five years. She gave the names and addresses of her nearest relatives, her nephew, the contestant, and the two nieces. She stated that the nephew was a blacksmith and a widower with no children. She gave his age, the fact that he had no brothers or sisters; that his mother was living, and that his father, Patrick Meade, a brother of the deceased, was dead. She also stated that the nieces were Sisters of Charity, gave their religious names and the convents where they were and their location. She then told Mr. Amend about the several bequests which she wished made, all of them being stated by herself except the $100 legacy to the institution for the blind, which he mentioned, after she stated that she would like to do something for the blind. Mr. Amend states that after she had given the instructions detailed above he asked her whether she did not want to leave any money to her nephew or her nieces, and she replied: " No; the nieces are in convents and don't need any money, and my nephew is not to have any of my money. I don't want him to have any of my money." She referred to a trust fund left by her brother, which she had the right to dispose of, and Mr. Amend says he examined the papers referring to this matter and found that her statements were correct. When she gave the name of one of the executors (Mr. Glinnen), a question arose as to the proper spelling of his name, and Mr. Amend told her to find out the correct way of spelling it and to send word to him. The following day, May fourteenth, the decedent wrote a letter to Mr. Amend inclosing a business card containing the name of Mr. Glinnen. Mr. Amend then made a draft will and mailed it to Miss Meade, who returned it, and on June 4, 1913, she went to Mr. Amend's office where she executed the paper offered for probate as her last will and testament. The will was witnessed by a Mr. Donnelly and a Mr. Denks, attached to Mr. Amend's office, and also by Mr. Amend, who acted as witnesses at her request, and the decedent then requested Mr. Amend to keep the will in his possession.

Regarding the codicil and the execution of it Mr. Amend's testimony is to the effect that about a year after the will was signed, Miss Meade notified him that Mr. Glinnen, one of the executors

named in her will, had died, and she wanted Mr. Amend to act as executor in his place. He suggested that perhaps it would be better if he were made sole executor, as the coexecutor, Monsignor McGolrick, was a clergyman, and clergymen did not usually desire to be concerned in business matters, and that perhaps he would prefer to be omitted. She decided not to make the change then, and accordingly the codicil was prepared substituting Mr. Amend for Mr. Glinnen; and this document was thereupon, and on the 3d day of June, 1914, executed by Miss Meade in the presence of the same witnesses whose names were attached to the will. Regarding Mr. Amend's suggestion as to being named as sole executor, there is in the record a letter written by decedent to him, stating that she would like to appoint him executor. · This letter is dated March 25, 1917, but was followed by another letter saying that she would leave the will as it was until she was better. This incident the contestant cites as bearing upon the question of the decedent's loss of memory, the fact being that Mr. Amend had already been named by her as executor; but undoubtedly what the testatrix had in mind was Mr. Amend's request to be her sole executor. This suggestion appeals to me as being entirely consistent with a good mind and memory on the part of the decedent, and seems to be no evidence of lack of testamentary capacity.

The foregoing narrative embraces substantially every fact in connection with the execution of the will and codicil, and not being contradicted, fully justified the finding of the jury that the instruments in question were duly executed by Miss Meade. In fact, there is a concession in the record by counsel for the contestant that every act the testatrix did in Mr. Amend's office, considered alone and without regard to her personality, was a rational act.

The evidence of these subscribing witnesses was in no way discredited or impeached, and because of the fact that they were present and saw the testatrix at the time that the will and the codicil were made, they had a better opportunity to observe, and more reliable sources of information in regard to her condition or whether or not she possessed testamentary capacity, than other witnesses. This will was executed with a careful observance of all forms of law. It was duly executed and should be probated, unless it was not the will of a competent testator. (*Matter of Dunn*, 184 App. Div. 386, 391.) Testamentary capacity has been defined to be the possession of enough mentality by a testator to understand and appreciate the nature and extent of his property; to know the relation he bears to those who would naturally be the objects of his bounty, and to know and understand what he is doing when he makes a will, *i. e.*, to understand the nature of the transaction.

(*Matter of Wolf*, 196 App. Div. 722; *Matter of Heaton*, 224 N. Y. 22, 29, 30.)

The proof in this case shows beyond any contradiction that Miss Meade fully understood and appreciated the nature and extent of her property. She lived in her own house, cared for and managed by herself for many years before her death. She regularly collected the rents from her tenants, put receipts for the exact amount of rent in their mail boxes on the very day she collected them; and personally made arrangements for the leasing of her apartments to them. She regularly deposited her money in the savings banks and personally made withdrawals therefrom. By habits of thrift and frugality she had accumulated an estate of $31,000; and when interest payments on her investments were not made on the day they were due, she was careful enough to make inquiry of her lawyers as to the cause of the delay. On the very day of the making of the codicil to her will, at her attorney's direction, she withdrew from her savings banks $2,525, to be used with the proceeds of a mortgage due to her in another mortgage investment which was withdrawn on the advice of her attorney, and left it with him. It will be recalled that she talked with her lawyer about the funds which she held in trust and over which she had the power of disposition; she personally and specifically named the amount which she wished to give to the various legatees, and these amounts do not exceed the value of her estate. This, I take it, manifests a clear knowledge of the nature and extent of her property. That she knew the relation she bore to those who would be the natural objects of her bounty is abundantly proven by the minute and particular directions which she gave to the draftsman of her will. She had the contestant in mind, and did not want him to have any of her property, and said so. The lawyer to whom she gave this information knew nothing of her relatives and family, and derived all of his knowledge concerning them from her. The fact that she knew and understood what she was doing when she made the will is abundantly proven. The incident of the spelling of the name of the proposed executor is an important fact to be considered; and the letter which is in the record in the handwriting of the testatrix herself also is eloquent testimony as to her testamentary capacity and ability to make a will.

In addition to the subscribing witnesses to the will and codicil, the proponent produced some fifteen witnesses who had known the testatrix some of them for many years, most of them neighbors and friends of the decedent, who testified in detail regarding the mental alertness of Miss Meade; all of this testimony covering many years before and after the will was executed. Evidence was also tendered

Second Department, March, 1922.          [Vol. 200

showing that in dealing with various tradesmen for a period of nearly seventeen years, she displayed a clear, active mind in reference to her property interests and her personal affairs, and that she was not accustomed to call upon anybody for help or assistance. Her memory was very good, and within two hours of her death she directed the women who were in attendance upon her the particular place in her rooms where they would find clean sheets for the bed; and to the doctor who was in attendance upon her in her last moments she showed her usual care and punctiliousness in paying her bills, in asking personally whether she should pay him then or on the following day. This incident took place the day before she died. Aside from the testimony of this one physician, there is no medical evidence produced upon the part of the proponent in this case, the simple reason being that the woman, according to the evidence, possessed unusually good health, and evidently did not require the attendance of a physician for the last fourteen or fifteen years prior to her death. She had at one time suffered from rheumatism, and was accustomed to carry a cane; and this incident is made much of in the contestant's evidence, where some of his witnesses testified that the decedent was seen upon the streets, sometimes brandishing a cane at young children who evidently annoyed her. The record discloses that she was, of course, aged, and naturally suffered the infirmities which would be expected from a person similarly situated.

As against the evidence adduced upon the part of the proponent, the contestant produced twenty-three witnesses, including three doctors. One of these doctors appeared solely as an expert, and testified only from a hypothetical question. One of the other physicians testified that five or six years before the date of the trial he had treated a woman whom the contestant told him was the decedent; and that he found her suffering from " hardening of the arteries," which he said had evidently been caused by a " stroke " and a " recovery " from a stroke. This witness said he thought the condition had existed for about ten years. On cross-examination he admitted that he had kept no record of his treatment of the woman, and that the only means he had of knowing that it was the decedent at all was the fact that the contestant told him so; that he had made an examination of her because the contestant told him that she was a " nervous case," and it was the contestant who furnished her " history " to him. The other doctor testified that he saw the deceased, and treated her four times in the early part of 1912 or 1913. He said that she had " hardening of the arteries " then. After this long lapse of time, while he remembered in detail the actions of the decedent, and the tests that he employed, he

could not remember what treatment he gave her. At the time he had been called in to see her he had only been in practice for one year. He had not treated her thereafter, and yet this medical man gave it as his opinion that the decedent was not of sufficient testamentary capacity to make a will. The record, however, contradicts him, for the testimony is clear that she possessed this ability, notwithstanding his opinion. The expert physician, of course, never saw the decedent; and his testimony is only entitled to the same degree of weight and credit that the testimony of any other expert would be entitled to, and no more. Such evidence has never been regarded as possessing much probative force, as Mr. Justice FOLLETT said in *Dobie* v. *Armstrong* (27 App. Div. 520, 526; affd., 160 N. Y. 584): "The experience of the courts has demonstrated that the answers of experts, though honestly given, to hypothetical questions embracing pages of assumed and isolated facts covering a long lifetime, about which facts the experts have no personal knowledge, are the weakest and most unreliable kind of evidence in respect to the sanity or insanity of the person inquired about." And so far as the non-professional witnesses are concerned, the weight to be given to their opinions depends largely upon the length and intimacy of the acquaintance, the intelligence of the observer, and whether the facts justified the conclusion. (*Seamen's Friend Society* v. *Hopper*, 33 N. Y. 619; *De Witt* v. *Barly*, 17 id. 340, 351; *Matter of Eno*, 196 App. Div. 131, 150.) The instances cited by the various non-professional witnesses in this case, offered with a view of attempting to show lack of testamentary capacity, do not possess, in my opinion, the necessary elements of truth and force to attach any credence to them. Most of them are concededly friends of the contestant, and a reading of their testimony shows that their recollection of the incidents testified to are largely based upon the promptings and the suggestions of the contestant, who thus seeks to make an indirect attack upon the mental capacity of his aunt, to whom he would have us believe he was devotedly attached. The record, however, is entirely barren of any facts or circumstances tending to show that there were any bonds of affection ever existing between himself and the decedent. She did not like him, she did not want him to have any of her property, and she plainly said so. Most of the incidents testified to by his witnesses relate to trivial things which are hardly worth mentioning. There is one circumstance upon which the contestant lays great stress, and that has to do with the visit or visits of the decedent to her lawyer's office at or about the time the will and codicil were executed. William A. Dennin, a police officer, swore

that on June 6, 1913, or thereabouts (June fourth being the day the decedent executed her will), he noticed a woman at Broadway and Murray street, New York city, evidently confused as to her whereabouts, and on accosting her she stated that she wanted to go to her lawyer in Beekman street; that he directed her to Beekman street and left her in the hands of his side partner, Officer Gieselberg, whom he told that the woman seemed somewhat dazed, and wanted to go to her lawyer in Beekman street. On cross-examination, this witness admitted that as he was returning to his post immediately after Gieselberg's attention had been called to the woman, the contestant appeared, came up to him and said, " Don't worry about her, officer; I will take care of her," and stated that she was his aunt. He also testified that she could not remember the name of her lawyer. The officer Gieselberg testified as to this incident. He fixed the date as of June 4, 1913, because he says that after he took the woman to the curb, the contestant came over to him and told him she was his aunt, and said to him, " Will you remember this occurrence? " The officers did not report the incident at the station house. I might here remark that the date of this occurrence and the identity of the woman is again furnished by the contestant. Another witness, an officer named Beaufrere, testified that on June 30, 1914 (which is the day the codicil was executed), he saw an old lady " sitting on the curb with her feet in the gutter, about fifty feet west of Park Row," fumbling a roll of bills that she had in her lap; that he asked her what she was doing there, and she replied that it was none of his business; that she was counting her money; that he said to her, " Why don't you put it * * * in your bag," and that she then did so; that there were some five or six men standing around looking at her, in a semi-circle; that he closed the bag for her; that she was somewhat feeble in her movements; that he asked her to get up, and helped her by taking her arm, and got her up on the curb; that she started to sway, and said she wanted her lawyer; that he asked her who her lawyer was, and she said she " did not remember his name," but knew he was on Beekman street; but that after about five minutes she did recall the name and said it was "Amend; " that then another officer named Schaff came over, and together they took her to the office of her lawyer. On cross-examination this witness testified that it was a very warm day, and that after leaving the lady at her lawyer's office, and while leaving the building, the contestant came up to him and said " that was my aunt you just brought in there." It is to be again noted that the identity is furnished by the contestant. Policeman Schaff testified to helping Officer Beaufrere take the lady to the office of her lawyer. He said that Beaufrere

asked her who her lawyer was, and she answered, "Amend;" that Beaufrere said, "Amend & Amend?" and the woman replied, "Yes."

Great stress is laid on the incidents just referred to as showing lack of testamentary capacity. I cannot see, in the light of the other testimony in this case, that the enlarged and exaggerated incidents referred to measure up to the degree of proof required to show lack of testamentary capacity. We have undisputed evidence in the case that the testatrix, a woman of advanced years, who always had taken care of her own affairs and taken care of them very carefully and prudently, went on the day mentioned from her own home in the eastern district of Brooklyn, over to the vicinity of Broadway and Park Row, in New York city, a distance of some seven or eight miles, without any help or assistance at all, to see her lawyer. The day being warm, she may have been overcome by the heat and become temporarily confused in that crowded neighborhood, which would not be in the least degree surprising; but she was not so devoid of mind or memory but that she remembered her lawyer and the very street in which his office was located. Certainly a momentary confusion of this kind is not to be wondered at. It surely cannot be said that it furnishes any probative evidence of lack of testamentary capacity; and if she was in the weak physical condition which the contestant would have us believe she was at the time, and if he was so devoted to her care and welfare, why did he not go to her assistance and extend help to her instead of waiting until she had gone into the building where her lawyer's office was located, and then approaching the policeman and asking him to remember the incident because the woman was his aunt? Incidents of this character are of too trivial a nature upon which to base a process for the destruction of a will. Great importance is also attempted to be given to the testimony of another witness named Jacobson, a hatter, who admits that he has been a personal friend of the contestant for thirty years. He swore that while the contestant was in his store buying a hat, a woman whom the contestant told him was the decedent, came into the store and demanded some rent from him, saying that she was the owner of the property. This same witness testified that he saw the same woman on two or three occasions on Manhattan avenue looking up at the sky and waving a cane, with some boys about her. He says that he again saw her "walking back and forth from the sidewalk to the roadway," near the Navy Yard, about five or six miles from her home; and upon his telling her that she was not in her own neighborhood, the woman maintained that she was. On cross-examination the witness testified that he fixed the time of these occurrences as

being in 1912, because he said the contestant had given him that year.

Such is the attack made by the contestant upon the will of the decedent, which, I think, upon a fair analysis of the testimony, cannot be deemed sufficiently strong to overcome the proof tendered by the proponent showing that the decedent possessed testamentary capacity.

There is no evidence in this case tending to show that at the time of the executing of the will and codicil the decedent was subject to any delusions. On the trial the testimony of the three subscribing witnesses, one of whom had known her for seventeen years, is that she was competent, and that her acts and conversations were entirely rational. Under these circumstances, I do not think that the surrogate was justified in submitting the question of the decedent's testamentary capacity to the jury; and the motion made by the proponent that the will be admitted to probate should have been granted. The charge is made by the proponent in this case that substantially the whole contest is built up upon the indirect testimony of the contestant. I think the charge is not extravagant when the evidence in the case is considered, for throughout the entire testimony offered the master mind and hand of the contestant is clearly apparent.

The verdict should be set aside on the ground that the evidence is insufficient to show lack of testamentary capacity, under the rule as laid down in the following cases: *Matter of Heaton* (224 N. Y. 22); *Matter of Wolf* (196 App. Div. 722); *Matter of Case* (214 N. Y. 199), and *Matter of Goodhart* (173 App. Div. 256). The decree of the surrogate refusing probate and the order denying the motion for a new trial are reversed, with costs to the executors, appellant, payable out of the estate, and the matter remitted to said court with directions to admit the will to probate, with costs to the executors, appellant, payable out of the estate.

BLACKMAR, P. J., KELLY, JAYCOX and YOUNG, JJ., concur.

Decree of the Surrogate's Court of Kings county refusing probate, and the order denying the motion for a new trial, reversed, with costs to the executors, appellant, payable out of the estate, verdict of the jury set aside upon the ground that the evidence is insufficient to show lack of testamentary capacity, and matter remitted to said court, with directions to admit the will to probate, with costs to the executors, appellant, payable out of the estate.