In the Matter of the Estate of George L. Duval, Deceased.

Surrogate's Court, New York County, February 9, 1932.

*Wood, Molloy & France,* for the executors.

*Rabenold & Scribner,* for Alice Duval Pearce.

*Battle, Levy, Van Tine & Fowler,* for Anna D. Chadwick and Anna C. Reinecke.

*William J. Schmitt,* for Cenacle of St. Regis, Inc.

*Clarke & Clarke,* for Catholic Centre for the Blind.

*Clarence A. Weill,* for French Benevolent Society of New York.

*Smith, Reiher & Griffin,* for St. Vincent's Home of The City of Brooklyn for the Care and Instruction of Poor and Friendless Boys.

*John T. Magan,* for Seton Hospital.

· *Antonio C. Gonzalez,* for Big Sisters of the Association of Catholic Charities and St. Mary Star of the Sea Academy, Long Branch.

*Charles G. Coster,* for Mission of the Immaculate Virgin for the Protection of Homeless and Destitute Children and Rev. Mallick J. Fitzpatrick.

*T. Louis A. Britt,* for Catholic Foreign Mission Society of America, Inc.

*Gillespie & O'Connor,* for the Society of St. Vincent De Paul.

*Gray & Tomlin,* for Catholic College of Immaculate Conception.

*John J. Barrett, Jr.,* for Society for the Propagation of the Faith.

*O'Brien, Boardman, Conboy, Memhard & Early,* for the Catholic University of America.

*Philip J. Dunn,* special guardian.

O'BRIEN, S. Contestants having conceded at the close of the trial of this will contest that all of the framed questions relating (1) to the statutory requirements covering the execution of wills and (2) to the charge of undue influence should as to the will and the three codicils be answered favorably to the proponents, thus leaving as the only issue to be determined the question of testamentary capacity and the proponents having moved for a direction of a verdict upon this issue in their favor, it becomes necessary to briefly state the mind of the court upon the law and upon the proofs adduced. The decedent was born in 1855. He died March 15, 1931. The propounded will was executed February 21, 1929, and the three codicils were executed respectively on March 4, 1929, the second codicil on January —, 1930, and the third codicil on November 11, 1930. Testamentary capacity has been clearly defined by the courts of this State. (*Matter of Heaton,* 224 N. Y. 22; *Matter of Eno,* 118 Misc. 186.) Contestants through certain

lay witnesses sought to prove that decedent who in his lifetime had given most generously to the building and maintenance of structures in the Mission of Immaculate Conception at Mt. Loretto, Staten Island, and to the construction and alteration of parts of the plant of St. Agnes Hospital for Crippled Children at White Plains, and who had furnished many articles of comfort and recreation to the children of these institutions and had spent many days and parts of days in playing and frolicking with these unfortunate children, had taken pleasure in causing pain to these objects of his extraordinary benefaction, constant interest and solicitude, especially to the little girls of tender years. Contestants also offered in evidence some seven wills and nineteen codicils to wills executed at various times beginning with the year 1902 and extending down to and including the propounded will and three codicils, various pamphlets, addresses, letters and books to show his constant devotion to the Blessed Virgin, Mother of God, and to her title of the Immaculate Conception; and also offered evidence of large gifts of money in his lifetime for the building of churches and asylums, grottoes, statues and altars dedicated to the glory of the Blessed Virgin and the spreading of devotion to her and the title of "Immaculate Conception."

Two alienists were then called by contestants and to them was propounded a hypothetical question embodying the testimony of their lay witnesses and their documentary proofs, and none of the proofs presented by the proponents. These alienists made answer to the question propounded and attempted to develop a theory that decedent was a victim of a perversion and of an obscession and thus lacked testamentary capacity.

Proponents produced the subscribing witnesses to the execution of both the will and the codicils, all of whom answered "rational" to the customary question asked of such witnesses. Each of the instruments included an attestation clause. In the envelope with the will was found a paper in the handwriting of decedent in which were set down the names or titles of the beneficiaries in this will and opposite each the amounts to be bequeathed to each. Then on the back thereof were certain figures which apparently represented a statement of his then available property and calculations of the aggregate amounts of certain groups of bequests. Copies of addresses made by decedent on various occasions, various letters written by him at about the time of the execution of the will and codicils were the strongest evidence of a brilliant and clear thinking mind and a dominant character and commanding personality. The most impressive array of witnesses who had contact with the maker of a will and have testified in contested will trials in the

court's experience took the witness stand in this trial and attested the rationality of testator. They included Mr. F. Coit Johnson, of J. H. Lane & Co., Percy W. Rockefeller, Bertram E. Hood, Charles G. Coster, George J. Gillespie and Henry B. Johnson, members of the bar, Lucien Jauvaud, president, and Dr. Robert H. McConnell, chief medical officer, of the French Hospital, Mary E. Brewer, Mary Cathleen Hennessy, Ex-Governor Alfred E. Smith, Rev. Dr. Lawrence T. Cole, rector of Trinity (Protestant Episcopal) School, George McAneny, former president of the board of aldermen and ex-transit commissioner, Walter H. Bennett, president of Emigrant Industrial Savings Bank, George H. B. Mitchell and Robert J. Cuddihy, president of Literary Digest. The testimony of these witnesses, of the subscribing witnesses, of Rt. Rev. Thomas J. Shahan, of Reverend Sister M. Carolus, of Mount Loretto Orphan Asylum, and Reverend Sisters M. Isabella and Clothilde, of St. Agnes Hospital for Crippled and Atypical Children at White Plains, together with the documentary evidence presented by the proponents, constituted evidence of a most preponderating character upon the question of testamentary capacity. Moreover, all the wills and codicils and trust deeds made by testator in his lifetime manifested the same general plan of distribution of his property as set forth in the propounded papers. At the close of the trial there could not be the slightest doubt that testator when he executed the will and the codicils knew the nature of the act that he was performing, the extent and scope of his property and the names and identities of those who would be the natural objects of his bounty and his relations with them. Little if any weight may be given to the alienists who appeared for the contestants. They had never known nor met testator, they had never analyzed nor read the propounded papers previously to formulating their answers to the hypothetical question, they had not known the exact proportions of his estate bequeathed to his relatives, they frankly admitted that they knew nothing about the Catholic religion nor about Catholic doctrines. Moreover, the assumptions set forth in the hypothetical question embodied a most inadequate part of the proofs submitted during the trial and in fact no part of the proponents' case and even that part of the testimony which was condensed in the hypothetical questions was in many instances clearly exaggerated and in almost every instance weak and unimpressive. In conclusion it should be noted that Dr. Riley, one of the alienists, testified as follows (p. 702): " Q. May I ask you this: It [the paper in testator's handwriting found with the will] would show he knew what he was disposing of, would it? A. Yes. Q. And it would show to him he was disposing of it, would it not? A. Yes. Q. And your

hypothetical question assumes that he knew, does it not, of his sister and relatives? A. Yes. Q. So that he knew who his relatives were when he made this will? A. Yes. Q. And he knew what he was disposing of, is that so? A. Yes; " and that Dr. Orton, the other alienist, testified as follows (p. 750): " Q. And if you found a will like that fortified by this letter to the executors and fortified by the memorandum in his own hand, what he wanted to do, you would say that he knew that he was disposing of his property, wouldn't you? A. Would he know that he was disposing of his property? Q. Yes. A. Of course. Q. And if he mentioned in that will every one, every surviving nephew or niece and other relatives you believe that he had in mind those in whom he was interested would you not? A. No question of it."

With the record in this trial as above indicated if the issue of testamentary capacity were submitted to the jury and the jury reported a verdict answering " No " to the question as to testamentary capacity, the court would be compelled to set aside such a verdict. The motion of proponents that a verdict be directed in favor of the proponents is granted and the jury is directed to answer " Yes " to said question. (*Matter of Heaton*, 224 N. Y. 22; *Matter of Eno*, 196 App. Div. 131; *Matter of Dunn*, 184 id. 386; *Matter of Burnham*, 201 id. 621.) Proponents' motion to impose costs upon the contestants is denied. Proceed accordingly.

OPINION DATED MAY 23, 1932, ON APPLICATION FOR SALE OF DECEDENT'S PARTNERSHIP INTEREST.

O'BRIEN, S. This is an application by Henry P. Molloy and Bertram E. Hood upon an order to show cause on notice to all the legatees and interested parties for instructions and permission to sell to the surviving partners the interest of the testator as a general partner in the limited partnership of Wessel, Duval & Co., which limited partnership was organized December 30, 1927.

The interest of the decedent in the capital of this partnership according to the balance sheet of said partnership as of December 31, 1930, was carried at $359,000.

Under the terms of the partnership (art. 9) upon the death of Mr. Duval, his interest as a *general partner* changed to that of a *limited partner* and his share of the partnership assets, to wit, $359,000, became the property of his estate and his share in the profits or losses from December 31, 1930, became 6.46148% thereof.

This partnership conducted business through many branches and agencies in Chile and Peru, and by reason of the long time required for communication between these various branches and agencies it is stated that it is not possible at this time to strike an accurate

balance sheet of the assets of said partnership as of today's date.

Approximate figures for the year 1931 show a net operating loss of $272,817.13, to which must be added the sum of $79,099.81, which is a shrinkage in the value of short term marketable securities; total loss amounts to $351,917.64.

This net operating loss has been charged as follows: $110,455.92 against general reserve; $162,361.91 is charged to the capital of the partners under the partnership agreement, of which amount $10,490.98 is properly chargeable against the capital of this decedent, thereby reducing the same from $359,000, which was the value carried on the books, to $348,509.02. The loss in the market value of the securities has not yet been charged to profit and loss account. Of this sum the estate's share is the sum of $5,111.02 which further reduces the capital of the decedent to the sum of $343,398.

The partnership agreement provides for distribution of profits to Mr. Duval in his lifetime or to his estate after his death at the rate of 6.46148% and in case of loss he is charged with the same per cent.

Furthermore, while the investment is carried on the books in American dollars, it represents assets that are realizable only in the currency of Chile, which currency has depreciated owing to the general depression.

The decedent on the 17th day of December, 1928, just before he made his will, made an estimate of the value of his property *in his own handwriting* and personally estimated the value of his interest in this partnership at $200,000, although at that time such interest was carried on the books at $359,000.

The executors have received an offer for the purchase of the interest of the deceased in this partnership of $262,500 in American dollars, payable $200,000 on date of closing and the balance, $62,500, one year thereafter, with interest at six per cent.

To deny the application for approval of this proposed sale would mean a liquidation of the partnership in accordance with the terms of the partnership agreement under which decedent became at his death a limited partner. Under the most favorable circumstances the liquidation would be long drawn out and with all the hazards involved in winding up a partnership conducting a business practically wholly in South American countries as stated in the moving papers would run undoubtedly to 1933, and perhaps until 1936, for its final completion. While the papers show substantial assets, the liabilities are large. Among the claimed assets are $652,697.40 accounts receivable, the larger part of which are due from customers in Peru and Chile, where also the greater part of the general merchandise items are spread out in several different localities.

Three different hearings have been had and long arguments heard. The proposition to sell will expire on Monday, May 23, 1932. The following legatees have given written consent to the granting of the application approving of the sale upon the terms presented: Catholic Foreign Mission Society of America, Inc., Catholic Big Sisters and Star of the Sea Academy, Long Branch, N. J., Catholic University of America, Cenacle of St. Regis, Inc., Cathedral College of the Immaculate Conception, Seton Hospital, Mission of the Immaculate Conception for the Protection of Homeless and Destitute Children, Catholic Centre for the Blind, Society for the Propagation of the Faith, St. Vincent's Home of the City of Brooklyn for the Care and Instruction of Poor and Friendless Boys, Society of St. Vincent de Paul in the City of New York, the French Benevolent Society (French Hospital).

The petitioners have consented upon the record in open court that the following provision be embodied in the decree: " Saving and reserving to Anna D. Chadwick and Alice Duval Pearce as next of kin and contestants herein, any and all rights which might be theirs to like effect as if this order had not been granted."

Upon all of the foregoing the court is of the opinion that it is for the best interests of all concerned, both the estate and the legatees, that this application be granted. Application granted. Order signed.